JOSEPH MONTAG

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa March 24, 1892.*

1. SANITY—*presumption of—burden of proof.* Every man is presumed to be sane, so that in the absence of evidence which may raise a reasonable doubt of the sanity of one charged with a criminal act, no evidence need be introduced on that point; but when the question of sanity is put in issue by facts coming from either side, which may raise such doubt, then it devolves upon the People to establish the sanity of the prisoner.

2. EVIDENCE—*res gestæ—what constitutes.* Declarations, to become a part of the *res gestæ*, must be made at the time of the act done which they are supposed to characterize or illustrate, and must be calculated to unfold the nature and quality of the facts they are intended to explain, and to so harmonize with them as obviously to constitute one transaction. What occurs before or after an act has been done does not constitute a part of the *res gestæ*, although the interval or separation may be very brief.

3. SAME—*conversation before the acts complained of—not res gestæ.* On the trial of one for the murder of his wife, it appeared that there

had been a difficulty between the parties, in which the defendant was required to leave his house by the wife, and that on the day of the homicide the defendant had a long interview with his wife, in which he sought for leave to return, which she refused, and that he then left the store where his wife was, and returned within a half hour and shot her, and then himself, her wound proving mortal. On the trial of the person committing the homicide, for murder, a witness was called, and allowed to testify to a conversation with the deceased about ten minutes after the defendant left the store and fifteen minutes before he returned, to the effect that the wife told her (the witness) that the defendant warned her (the wife) that if he could not come and see her that night he would kill her: *Held,* that such statement was not a part of the *res gestœ,* and that the court erred in its admission.

4. CRIMINAL LAW—*on a trial for murder the court is not required to volunteer an instruction on the question of sanity.* On the trial of one for murder, where no instruction is asked by him on the question of his sanity, and there is no sufficient evidence that will justify a verdict of insanity, the court will not be required to volunteer an instruction on the question of the sanity or insanity of the defendant.

5. SAME—*voluntary intoxication—no excuse for crime—instruction concerning must be based on the evidence.* On the trial of one for murder, where the evidence failed to show that the offense was committed by the defendant while intoxicated, or that he was unconscious of what he was doing, or temporarily insane from intoxication, the court instructed the jury that "voluntary intoxication furnishes no excuse for a crime committed under its influence, even if the intoxication is so extreme as to make the author of the crime unconscious of what he is doing, or to create a temporary insanity:" *Held,* that the instruction was improperly given.

6. SAME—*sufficiency of legal proof—effect of erroneous damaging evidence.* Where the jury are required not only to pass upon the defendant's guilt, but also upon the measure and extent of his punishment, the admission of erroneous evidence of a highly damaging character is not rendered harmless from the fact that the other evidence clearly shows defendant's guilt, as such evidence may affect the nature of the punishment inflicted by the jury.

7. INSTRUCTIONS—*not based on the evidence—when reversible error.* If, when an instruction having no sufficient basis in the evidence is given, the reviewing court is able, from the nature of the case, to say it had no tendency to mislead the jury, then, though improperly given, it will afford no ground of reversal. But in a case involving the life of the defendant, when there are other errors in the record, a judgment of conviction will be reversed.

8. SAME—*announcing mere abstract propositions of law.* It being an elementary principle that an instruction to a jury should be based upon

evidence from which it legally and logically results, it is not error to refuse an instruction which announces a mere abstract proposition of law not suggested or warranted by the evidence in the case. On the other hand, it is error to give such an instruction where the giving of it will have a tendency to mislead the jury.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

Mr. N. A. KAUFMANN, and Messrs. ALSCHULER & MURPHY, for the plaintiff in error:

The burden of proof to show the sanity of the defendant is upon the prosecution. *Hopps* v. *People*, 31 Ill. 385; *Chase* v. *People*, 40 id. 352; *Dacey* v. *People*, 116 id. 555; *State* v. *Crawford*, 11 Kan. 53; *People* v. *Garbutt*, 17 Mich. 9.

Whenever the question of sanity is raised and put in issue by such facts, proven on either side, as engender a reasonable doubt of sanity, it devolves upon the prosecution to remove it, and to establish the defendant's sanity beyond a reasonable doubt. *Cunningham* v. *State*, 56 Miss. 269; *Wright* v. *People*, 4 Neb. 407; *State* v. *Bartlett*, 43 N. H. 224; *State* v. *Pike*, 49 id. 399; *O'Connell* v. *People*, 87 N. Y. 377; *People* v. *Mc-Cann*, 16 id. 58; *Dove* v. *State*, 3 Heisk. 348.

There was no evidence of the intoxication of the accused, and hence the instruction based on that theory was improper, and calculated to mislead.

The statements made by the deceased to the witness, not in the presence or hearing of the defendant, was improperly admitted. It was hearsay. *Railroad Co.* v. *Johnson*, 116 Ill. 206.

The testimony was not admissible as a dying declaration. *Montgomery* v. *State*, 80 Ind. 338; *Jones* v. *State*, 71 id. 66.

It was not a part of the *res gestæ*. *Weyrich* v. *People*, 89 Ill. 90; *Montgomery* v. *State, supra; Jones* v. *State, supra; State* v. *Pomeroy*, 25 Kan. 349; *Smith* v. *State*, 53 Ala. 486; *Jackson* v. *State*, 20 id. 305; *State* v. *Rider*, 90 Mo. 54; *State*

v. *Dominique,* 30 id. 485; *People* v. *Carkhuff,* 24 Cal. 640; *Check* v. *State,* 35 Ind. 492.

Mr. George Hunt, Attorney General, for the People:

The evidence was too meager to raise the question of defendant's insanity.  If the defendant desired instructions on the question, he should have asked the court to give them.

The instruction as to intoxication was harmless, and there was evidence of his intoxication at various times in the last few years.

The evidence of the statements of the deceased could work no harm.  Independent of this evidence the proof of the homicide was ample.  The case was fully made without this evidence.

Mr. J. M. Longenecker, State's Attorney, and Mr. C. G. Neely, Assistant State's Attorney, also for the People:

The statements of the deceased were admissible as part of the *res gestæ.*  2 Bishop on Crim. Proc. sec. 62; Wharton on Crim. Evidence, (9th ed.) secs. 262, 263.

Mr. Justice Craig delivered the opinion of the Court:

At the June term, 1890, of the Criminal Court of Cook county, Joseph Montag, plaintiff in error, was indicted for the murder of his wife, Anna Montag, on the 9th day of June, 1890.  A trial of the cause before a jury resulted in a verdict of guilty of murder as charged in the indictment, and the jury fixed the punishment at death.  The court overruled a motion for a new trial and rendered judgment on the verdict, and the defendant applied for and obtained this writ of error, which was made a *supersedeas.*

It appears from the record that plaintiff in error was engaged in the mercantile business, for several years, at 129 North Clark street, Chicago.  In the latter part of May, 1890, Eickmeier, a son-in-law, obtained a judgment against plain-

tiff in error, levied upon the stock of goods, and upon a sale the stock was bought by Mrs. Eickmeier, a daughter of the defendant. She then carried on the store, defendant's wife acting as cashier. The defendant and his wife resided at No. 107 Wells street, and Mrs. Eickmeier resided next door. About the middle of May a difficulty arose between the defendant and his daughter, Mrs. Eickmeier, in which defendant's wife took sides with the daughter. The result of this difficulty was, defendant was required by the wife and daughter to leave the home residence. The fact that defendant was required to leave home seems to have been the source of considerable trouble to him, and he made several efforts to induce his wife to consent to his return. On June 9 he called at the store between twelve and one o'clock, and had a long interview with his wife, remaining some two hours, but his wife did not consent that he might return home. Defendant then left the store, but returned in about a half hour and shot his wife, and in the alley in the rear of the store he shot himself. The wife died a few moments after she was shot, but the wound defendant inflicted on himself did not prove to be dangerous.

There is no substantial controversy in regard to the facts. The fact that the defendant shot and killed his wife is conceded. That the homicide was deliberately and intentionally committed is beyond dispute; but counsel for the defendant, as we understand the argument, rely upon three alleged errors to reverse the judgment: First, that the evidence does not show that the accused was of such sound mind at the time of the killing as to support a verdict of guilty; second, that instruction No. 21, given for the People, was erroneous; and third, that the court improperly permitted a witness to state what the deceased told her the accused had said ten or fifteen minutes before the killing.

Much is said in the argument in regard to the proof of insanity, and the burden of proof on that question in a case of this character. The law on that subject is plain and well

understood. Every man is presumed to be sane, and in the absence of evidence which may raise a reasonable doubt of sanity, no evidence need be introduced; but whenever the question of sanity is put in issue by facts coming from either side, which may raise such doubt, then it devolves upon the People to establish the sanity of the prisoner. (*Cunningham* v. *The State*, 56 Mass. 269; *The People* v. *Garbert*, 17 Mich. 9; *Hopps* v. *The People*, 31 Ill. 394.) In this case the People offered no proof whatever on the question of the defendant's sanity. We are, however, inclined to think that no proof was required. There was evidence that the defendant was in trouble with his family, that he was disturbed in mind, and perhaps somewhat excited; but there was little or no testimony which, when properly considered, could raise a reasonable doubt in regard to the sanity of the defendant.

In this connection complaint is made that the court failed to instruct the jury in regard to the form of verdict in case they should find the defendant insane at the time of the homicide. No instruction was asked by the defendant on this question, and the court could not be required to volunteer an instruction, especially when there was no sufficient evidence which would justify a verdict of insanity.

Instruction numbered 21, complained of, was as follows:

"The court instructs the jury that voluntary intoxication furnishes no excuse for a crime committed under its influence, even if the intoxication is so extreme as to make the author of the crime unconscious of what he is doing, or to create a temporary insanity."

The evidence fails to show that the offense was committed by the defendant while intoxicated, or that he was unconscious of what he was doing, or temporarily insane from intoxication. The evidence on this question was, briefly, as follows: Bell testified: "Defendant said he had been drinking previous to this day, as I understood it. I should think he was drinking that day. I could smell liquor from his breath. Could not

tell how much or how little he had been drinking." Ida Hoerneffer, who was present when the shooting occurred, and during several interviews of the accused with his wife, testified: "I did not see anything to indicate that he was drinking. * * * When he was in there the fourth time I did not see anything in his manner that would indicate that he was intoxicated." Henry Montag testified: "I saw him at nine o'clock, and at one o'clock in the afternoon, on the day of the shooting. He seemed excited. I can not say that he was intoxicated." William Welty, who saw him two hours before the shooting, testified that "he was sober at that time."

There was some other evidence in regard to the defendant's habits for sobriety, but we find no other evidence in regard to the intoxication of the defendant at the time of the shooting. There was therefore no evidence introduced on the trial that could justify the instruction, or upon which it could be predicated. This is conceded in the argument for the People, but it is claimed that as there was no evidence to which the instruction could be applied by the jury they could not be misled by it. The object of an instruction to the jury is clearly laid down in *Baxter* v. *The People,* 3 Gilm. 381, where it is said: "The object of instructions is to convey to the minds of the jury correct principles of law as applicable to the evidence which has been laid before them, and nothing should be given them unless it will promote that object." In *United States Rolling Stock Co.* v. *Wilder,* 116 Ill. 105, in considering the same question, it is said: "It is an elementary principle, of universal application, that all instructions to a jury should be based upon evidence from which it legally and logically results,—that it is not error to refuse an instruction which announces a mere abstract proposition of law not suggested or warranted by the evidence in the case. On the other hand, it is error to give such an instruction where the giving of it will have a tendency to mislead the jury. If, however, where such an instruction is given, the reviewing court is able, from

the nature of the case, to say it had no such tendency, then, though improperly given, it will afford no ground for reversal."

There are doubtless many cases where the giving of such an instruction would do no harm, but in a case of this character, where the life of the accused was at stake, we are not prepared to say that the instruction had no tendency to mislead the jury. We do not hold that the giving of this instruction of itself, if the record disclosed no other error, would be sufficient ground upon which the judgment should be reversed. It is not necessary so to hold, as the record discloses another error far more serious than the one just considered.

It will be remembered that on the day of the homicide the defendant called at the store where the shooting occurred, between twelve and one o'clock, and had an interview with the deceased, lasting some two or three hours. He then left the store, but in a short time returned, and then the shooting occurred. The witness Ida Hoerneffer was allowed to give a conversation she had with the deceased, which occurred ten minutes after defendant had left the store, and fifteen minutes before he returned. In answer to the question, "What did the deceased say to you after he had been out ten minutes?" she replied: "She told me that he warned her if he couldn't come and see her that night he would kill her. I asked her if she wasn't afraid, and she said no."

Any declarations or threats that the defendant may have made were competent evidence against him, and if the witness had heard the defendant make the statement which the deceased narrated to the witness, she might have given that statement to the jury. But the declaration was not that of the defendant, but of the deceased, and we are aware of no principle upon which it was admissible unless it was a part of the res gestæ. Anything said or done by the deceased or the defendant at the time of the homicide was competent, as a part of the act itself. Greenleaf (vol. 1, sec. 108,) says: "The principal points of attention are, where the circumstances and

declarations offered in proof were contemporaneous with the main fact under consideration, and whether they were so connected as to illustrate its character." And in the note to the text it is said: "Declarations, to become a part of the *res gestæ,* must have been made at the time of the act done which they are supposed to characterize, and have been well calculated to unfold the nature and quality of the facts they were intended to explain, and to so harmonize with them as obviously to constitute one transaction." (See, also, *Weyrich* v. *The People,* 89 Ill. 96; *The People* v. *Carkhuff,* 24 Cal. 640; *Cheek* v. *The State,* 35 Ind. 432; *Montgomery* v. *The State,* 80 id. 338; *The State* v. *Pomeroy,* 25 Kan. 349.) Here, the declarations of the deceased were made in the absence of defendant. It is true, he appeared fifteen minutes after the declaration of the deceased and committed the homicide; but if what the deceased said fifteen minutes before is admissible as a part of the act, upon the same principle what she may have said six hours or twenty-four hours before was also admissible.

In *Montgomery* v. *The State, supra,* in speaking in regard to the admission of dying declarations, the question under consideration is also discussed. It is there said: "Matters which do not form part of the *res gestæ* are not provable by dying declarations. The rule is confined to a statement of the circumstances connected with the fatal act, and forming a part of the same transaction. It is quite well settled that what occurs before or after the act has been done does not constitute a part of the *res gestæ,* although the interval of separation may be very brief." The same doctrine is announced in *The State* v. *Pomeroy, supra.*

But it is said in the argument, omitting this evidence entirely, the remaining evidence shows plainly that the defendant is guilty of murder. Conceding that the other evidence is sufficient to warrant the jury in finding the defendant guilty of murder, that fact alone does not meet the difficulty. Sec-

tion 142 of our Criminal Code provides: "Whoever is guilty of murder shall suffer the punishment of death, or imprisonment in the penitentiary for his natural life, or for a term not less than fourteen years. If the accused is found guilty by a jury, they shall fix the punishment by their verdict." Under this section of the Criminal Code the jury not only pass upon the guilt of a defendant, but they also determine what the punishment shall be,—whether it shall be death, or imprisonment for life, or imprisonment for fourteen years. Where the evidence makes out an aggravated case, the jury will be likely to visit upon a defendant a severe punishment,—the severest known to the law; but, on the other hand, where the evidence does not show that premeditation and deliberation which characterize an aggravated case of murder, they would be likely to fix upon the lesser punishment provided by the statute. The testimony admitted was of the most damaging character. Here was a deliberate threat, made a short time before the shooting, to take the life of the deceased, and when this evidence was admitted for the consideration of the jury, with the sanction and approval of the court, it doubtless had an important bearing on the minds of the jury in determining the punishment that should be inflicted upon the defendant for the crime he had committed. Indeed, the evidence could not do otherwise than have a controlling influence with the jury. Under such circumstances it can not be said the defendant has had a fair trial,—one that is guaranteed by the law.

The judgment will be reversed and the cause remanded.

*Judgment reversed.*