(No. 31868

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ERNEST HUBERT PUGH, JR., Plaintiff in Error.

*Opinion filed September 21, 1951.*

CECIL L. CASS, and BURTON HUGH YOUNG, both of Chicago, (SAMUEL D. GOLDEN, of counsel,) for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and ROBERT C. NELSON, State's Attorney, of Waukegan, (SIDNEY H. BLOCK, RICHARD R. BAIRSTOW, and HARRY L. PATE, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

The defendant, Ernest Hubert Pugh, an eighteen-year old sailor, was indicted for rape in the circuit court of Lake County on November 1, 1945. Upon a jury trial the defendant was found guilty and his term of imprison-

ment was fixed at 50 years. By this writ of error the defendant seeks from this court a review of the record of conviction and sentence.

At about 8:00 o'clock in the evening of August 10, 1945, the prosecuting witness, about 20 years of age, went to the Victory Memorial Hospital in the city of Waukegan to visit her mother and later the girls in the nurses' home. It was approximately 10:30 in the evening when she left the hospital, intending to go to the corner of Sheridan Road and Glen Flora Avenue to catch a bus which was due momentarily for Zion, Illinois. Soon after reaching the intersection, where a street light was burning, she noticed, approaching her from the south, a young man dressed in a sailor's uniform, whom she later identified as the defendant. He inquired of her: "Is this where you catch the bus to Zion, Illinois?" She answered: "Yes, it is." Only a short interval of time elapsed until the bus appeared and at that time she felt his arm go around her neck, whereupon she was choked into unconsciousness and dragged into a schoolyard where she was ravished, beaten and completely disrobed. She was his victim for about one-half hour. It would serve no useful purpose to defile the reports of this court with a complete account of the revolting details of the attack. Suffice it to say that the proof indicated a type of sexual perversion and sadism where pleasure is apparently derived from the act of being cruel to another.

After prosecutrix had regained consciousness and discovered that the defendant was in the act of lowering his trousers, as if to have sexual intercourse a second time, she ran away from him and was successful in her flight to the hospital. Then Dr. George B. Callahan, a specialist in the field of gynecology, and a member of the staff of the hospital, was immediately called. Upon examination, he found the girl was in severe shock; bruised about the neck in such manner that strangulation was suggested; bleeding from abrasions on various parts of the body and the nose;

also a bleeding from a tear in the vagina and from the perineum body; he found that the hymen had been ruptured and it was his opinion that it had not been disturbed before. Her condition was so critical that Dr. Callahan remained with her throughout the night.

There were several witnesses called by the State who testified concerning the condition of the prosecuting witness when she returned to the hospital,—nervous, exhausted, bleeding, and completely nude.

A Waukegan police officer also testified that he had received a report of this criminal assault and immediately went to the school ground where the events had occurred. Inside the gate he found a change purse. Deeper in the schoolyard he found a watch, pieces of clothing, a brassiere, a girdle, and a white dress "all torn in pieces and strewn all over the ground." He also found signs of a struggle and pools of blood.

Apparently, the defendant became involved in some difficulty in Oak Park on October 24, 1945, and as a result was arrested and questioned by Captain of Police, Thomas P. Kearin. He was asked about the occurrence of August 10 in Waukegan. This led to a complete confession by the defendant. The following day he accompanied the Oak Park and Lake County officials to Waukegan where he very candidly pointed out the various places in the schoolyard and stated with accuracy what he did on the night of August 10.

Counsel for plaintiff in error present a voluminous brief containing many assignments of error and hundreds of citations, many of which we found not in the least helpful.

The defendant claims that he was rushed into trial summarily and hastily, without an opportunity for adequate preparation. On this subject, the record discloses the following: He was indicted on November 1, after being apprehended on October 24; he was brought before the

court on November 10 and the cause was continued to November 14, on which day defendant appeared with his counsel. At that time a motion to quash was entered, which was overruled and a plea of not guilty entered. On December 7, the defendant, with his counsel, again appeared before the court and presented a motion that he be taken to Chicago in custody of the sheriff for the purpose of being examined by a psychiatrist. This was denied. Then the prosecution moved for a setting of the cause for trial on December 12. The defendant asked for an order that would authorize a psychiatrist to examine him privately. This was allowed, but no effort was made by defendant's counsel or anyone in his behalf to cause such an examination to be made. Then defendant's counsel, indicating a shortage of money to employ a mental expert, asked that the State supply the defense with a complete report from their psychiatrist. The court ordered the State's Attorney to furnish defendant's attorney with a copy of such report. No written motion for continuance, supported by affidavits, was ever filed. There were 28 days intervening between the time defendant appeared in court with his counsel and the day the cause was set for trial. Orally, the defendant's counsel asked for further time because of their inability to obtain an alienist to testify. The defense was fully aware of the necessity for such proof early in the proceeding, and it appears that they could not procure the services of an expert either because of lack of funds, or because of their inability to find one who would testify favorably. The court was without authority to appoint an expert to examine the defendant. *People* v. *Scott,* 326 Ill. 327, 345.

On December 7, the trial court and defense counsel engaged in an extended colloquy touching the propriety of the setting of the cause for trial on the following Wednesday and the right of the defendant to withdraw his plea of not guilty and request a hearing under section 12 of divi-

sion II of the Criminal Code, (Ill. Rev. Stat. 1949, chap. 38, par. 592,) which authorizes the court to impanel a jury to ascertain whether or not said person is insane. The prosecuting witness was leaving for school and would not be available as a witness after the week of December 12. The court was aware of the fact that the defense had let three weeks go by without making a very serious effort to obtain the services of a psychiatrist, and that the defense still had an opportunity to present the insanity issue on the trial of the cause. The record discloses that the court most studiously and earnestly considered all the pros and cons of defense motions preliminary to trial, and we are convinced that he did not act arbitrarily or abuse the discretion vested in him in overruling defendant's motion for continuance and for leave to withdraw his plea of not guilty. *People* v. *Geary,* 298 Ill. 236.

On the trial, the only evidence adduced on behalf of defendant which touch the issue of insanity was as follows: Joseph Zumbardt testified that he had known the Pugh family in Chicago for about nine years; that he saw the defendant six or seven times a year; that he had occasion to observe his conduct when other people were around; that his appearance was neat, but that he seemingly preferred to be around with the fellows and would always shy away from women and prefer to be with men and talk on sport questions. Pearl Weeks testified that she had known defendant since childhood and in recent years saw him three or four times a year; that he was involved in a serious automobile accident in 1934 in which he suffered head injuries that resulted in his nose being severed; that he was conscious of his facial disfiguration and never seemed to be friendly toward girls, and that he was always very bashful. Ruth Virginia Pugh, the mother of defendant, testified that her son was prematurely born and lived in an incubator for two months immediately upon his arrival; that he was undernourished and under a doctor's

care for a considerable time after his birth; that her husband had abandoned her when Ernest was a mere baby; that the burden of caring for her son and earning a living was not a simple one; that he was involved in an automobile accident in March, 1934, and that he had worn a plastic nose since then; that he has always been a good boy, but shy around people; that he was ashamed of his personal appearance; that he would frequently be heard saying "I am nothing handsome to look at and anyway if they have anything to do with me it would be just because they are sorry for me." She also testified that he was quite athletic in high school where he played football; that he was five feet ten inches in height and weighed 148 pounds. The defendant took the witness stand and summarized his difficulties as follows: "I felt sort of abnormal around girls. I felt like they were sort of looking at my nose—I don't know—I didn't feel comfortable around girls."

The foregoing is a complete resumé of all the evidence introduced at the trial relevant to defendant's alleged insanity. The court refused to give any of defendant's tendered instructions on the insanity issue and refused to permit defendant's counsel to discuss that issue in his closing argument to the jury. In this connection the court said "I am refusing the instruction on insanity because there is no evidence, in my opinion, tending to show insanity sufficient to leave it to the jury." This ruling by the trial court is assigned as error.

There was no evidence as to defendant's mental condition on the date when the crime in question was committed. All the testimony offered on the subject was concerning his unfortunate accident when he lost his nose and was compelled to go through life with its replacement, and that, consequently, he was embarrassed in the presence of females. There is absent from the record any testimony that would indicate that the defendant was in any way

mentally disturbed; or that he was ever subnormal or weak mentally; or anything that remotely suggests that defendant was incapable of discerning right from wrong. In the absence of proof of lack of such understanding, one accused of crime cannot avail himself of the defense of insanity. (*People* v. *Redlich,* 402 Ill. 270; *People* v. *Marquis,* 344 Ill. 261.) In the *Marquis case* the defendant sought to show by an expert witness, in answer to a charge of murder, that he had a mental capacity similar to that of a child of twelve years; it was held that the court properly refused such testimony to be admitted. The court said, on page 267: "There is no merit in this alleged error. Criminal responsibility depends upon whether the accused knows the difference between right and wrong, can understand his relation to others and that which others bear to him, and has knowledge of the nature of his act so as to perceive its consequences to himself and others."

In the instant case, the record shows that the defendant immediately after committing the act in question removed his stained clothes and sent them to the laundry and within a very short time thereafter moved to another section of the State. In addition thereto, just before the prosecutrix escaped a second attack which he attempted, he told her in effect that he would not let her go because she would run to the "coppers." He was not apprehended for some considerable length of time and continued to perform his daily duties in the navy at the base where he was stationed. After he was apprehended he made a complete confession, directed the officers to the scene of the crime and traced for the officers every circumstance and every detail of the assault on the prosecutrix. His narrative of the occurrance was corroborated by many witnesses, and he, the defendant himself, has not variated from it at any time.

Quite appropriate is the language used by the court in *Doyle* v. *People,* 147 Ill. 394, wherein complaint was made that the court erroneously refused two instructions on the

question of sanity. They each assumed that the mental condition of the defendant at the time of the homicide was an issue in the case. The court said: "Waiving all other objections to each of these instructions, they were very properly refused upon the ground that there was no evidence whatever upon which to base them. It would be mockery under the evidence in this record to attempt to excuse or mitigate the killing on the ground of the defendant's insanity." (*Fisher* v. *People,* 23 Ill. 218, *Chase* v. *People,* 40 Ill. 352; *Dacey* v. *People,* 116 Ill. 555; *Montag* v. *People,* 141 Ill. 75.) In *People* v. *Casey,* 231 Ill. 261, the court held that in dealing with the question of insanity the court must treat such subject and weigh it in the same manner as it should other defenses, such as alibi, self-defense or accidental homicide.

In the case of *Green* v. *Phoenix Mutual Life Ins. Co.* 134 Ill. 310, the court held that no hard-and-fast rule can be formulated as to the quantum of evidence necessary to establish insanity, but there must be at least sufficient evidence to overcome the legal presumption of sanity. Also, in *People* v. *Jackymiak,* 381 Ill. 528, the court points out that it is improper for a trial court to give instructions on insanity or intoxication, whether they are offered by the People or the defendant, where there is no evidence which would be sufficient to raise such question.

In *State* v. *Wallace,* 131 Pac. 2d 222, it was contended that an issue of sanity was raised because of the extremely brutal manner in which human life was destroyed. At page 228, the court said "This presents a fundamental question: Is it the duty of the Court to submit the issue of insanity as a defense whenever specific instances of strange, irrational or depraved conduct are made to appear in the State's evidence? The answer is: 'No.' If it were otherwise, it would be necessary to insist on the sanity defense and submit that issue by special form of verdict in substantially every murder case and in innumerable other

cases for which there is no justification in theory, practice or precedent."

The circumstances surrounding the instant crime show certainly an abnormal, sadistic and diabolically cruel mind. The crime that the defendant committed was bestial and revolting—most shocking to society and his young victim. She was most fortunate to escape his fiendish and demoniacal attack without the loss of her life. The court was correct in his analysis of the situation, namely, that he should be considered not an insane person, but a vicious criminal and dealt with accordingly.

Reversal of the judgment entered in this case is also sought on the ground that the trial court erroneously admitted into evidence the confession obtained and signed in Oak Park. The court heard evidence from the several officers present, describing, out of the presence of the jury, the circumstances under which the confession was obtained. There is no claim of force, intimidation or mistreatment. There is the claim of implied promise flowing from the alleged statements made by officer Nester and the State's Attorney that it would be well for him to tell the truth and candidly state the facts. The defendant's version briefly is: "I was surrounded at the police station by police officers and State's Attorney Hall who asked me if I wanted to make a statement. I sat there for a minute, I didn't know what to do and Mr. Nester came up to me and put his hand on my shoulder and he says 'Herb, it will be better if you would give Mr. Hall a statement.' I felt I was better off by making a statement—I thought that leniency might be shown. That belief influenced me into making a statement." On cross-examination the defendant admitted that the answers he made in the confession were true. When he took the stand in his defense, he admitted the salient facts relating to his attack upon the prosecutrix. His memory on some of the details had failed some.

The law seems to be well settled that a confession is inadmissible when the circumstances surrounding its making were such that the accused might have been induced to make a false confession. Defendant's statement was not false. He admits that every detail contained therein is true. In the case of *People v. Barber*, 342 Ill. 185, there was testimony by the sheriff that "All he said was, defendant had just as well come across and tell the truth," and the defendant had testified that the sheriff had told him what to say, and that the confession was untrue. Nevertheless, the court said: "The trial judge had before him the witnesses who were present when the written statement was made and was in position to determine the weight and credibility to be given the testimony of defendant, the sheriff and his deputy. The court admitted the confession, and we see no reason to disagree with that ruling and conclusion."

The defendant in this claim of error relies principally upon the case of *People v. Heide*, 302 Ill. 624. Therein statements were made such as "you better tell the truth," and that if the defendants told the truth, they would be taken to the State's Attorney's office where they could make a statement. But the significant difference between the *Heide case* and the case under consideration lies in the fact that in the *Heide case* the defendant was actually told that if he did tell the truth he would be given leniency. In other cases cited by the defendant, acts of violence were proved, or there were definite offers of leniency. The rule is correctly stated in *People v. Klyczek*, 307 Ill. 150, wherein a police officer told the defendant that the best thing he could do was to tell the truth about everything he had done. Therein, the court points out, as it did in the *Heide case,* that there are decisions in other States which hold that telling a prisoner that it would be better for him to tell the truth is regarded as holding out an

inducement, or a threat within the rule that excludes confessions, but the court said, on page 154: "In other cases it has been held that telling a prisoner that it would be better for him to tell the truth is not the offering of an inducement to him to confess or the making of a threat for that purpose. [Citations.] These decisions seem to have the better reason. It is not reasonable to suppose that advice to one accused of crime that it is better for him to tell the truth would of itself be an inducement to him to tell an untruth or would alone be a sufficient inducement to make a statement falsely confessing crime. Mere exhortation to tell the truth will not make a confession afterward made, inadmissible, but the statement that it is better to tell the truth may be made under such circumstances as to make a confession afterwards made incompetent. If there is coupled with the advice a suggestion of a benefit in the particular case, a confession by reason of such advice and suggestion is incompetent."

In view of the foregoing analysis, we are of the opinion that the court did not err in admitting into evidence the entire confession of the defendant.

It is also claimed by plaintiff in error that prejudicial error was committed by the State's Attorney in his closing argument to the jury, which embraced the following: "This crime * * * must never occur in this county, or in any other county again, you must stop it so that it is not done again." Needless to say, the argument did contemplate a rather far-reaching effect that might stem from a severe sentence. It might be observed that counsel for defense made no objection at any time to this argument. Nevertheless, it was a proper reply to the argument made by defense counsel, which was nothing more than an appeal for sympathy and leniency. Without objection, defendant's counsel was privileged to recount all the vicissitudes of his mother in her struggle to rear this young man, without the

596

assistance of his father, his sad misfortune when his face became disfigured and his sensitivity because of his personal appearance.

In *People* v. *Wood*, 318 Ill. 388, at page 391, the court said: "The State's Attorney had the right to present his side of the case to the jury and to urge them to rid the community of a character like the one plaintiff in error was shown to be by the evidence offered by the State's Attorney. Under the circumstances we do not regard the argument of that character which would justify a reversal." We are of the opinion that the State's Attorney's argument did not constitute prejudicial error.

Other errors are assigned and argued by defendant, and we have carefully considered all of them but find none with such merit that we feel justified in extending this opinion with a discussion of same.

In view of the undisputed character of the evidence in this record, there is no doubt of the defendant's guilt. No prejudicial error was committed. The jury's determination has our approval. The judgment entered thereon should not be disturbed.

*Judgment affirmed.*