107 So.2d 16 (1958)
John FRAZIER, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
November 21, 1958.
Rehearing Denied December 16, 1958.
*17 Ira J. Carter, Jr., Gainesville, for appellant.
Richard W. Ervin, Atty. Gen., and Odis M. Henderson, Asst. Atty. Gen., for appellee.
O'CONNELL, Justice.
John Frazier appeals from a judgment and sentence of death for the murder of Lacie Pearman. Defendant is a negro, as was the deceased.
Lacie Pearman lived some distance from the rural home of defendant and Annie Lee Frazier, who lived with him as his wife. The sister of Annie Lee Frazier, Willie Mae Perry, lived adjacent to the Fraziers. Willie Mae and Lacie were cousins.
On a Saturday afternoon Lacie, the Fraziers and Willie Mae Perry went to town *18 and returned to Willie Mae's house. Later that afternoon and while Lacie was still at the home of Willie Mae Perry, defendant departed his home telling his wife that he had to check some fish lines in a nearby river. He returned to his home after dark. His wife noticed a scratch above one eye,
After defendant departed to check his fish lines, Lacie left in her car to go home by a route which required her to open and go through three fence gates. She had promised to return to Willie Mae Perry's house the next morning.
She did not return as promised and Willie Mae went to determine why she did not do so. She found Lacie's car, with the groceries she had purchased on Saturday still in the car, parked just inside the fence gate nearest Lacie's house. However, Lacie could not be found.
The Sheriff was notified and came to the scene, but because of darkness no search was made that day, which was Sunday.
The next day the neighbors were organized and a search conducted under direction of the Sheriff.
In the undergrowth near the fence gate at which Lacie's car was found, a trampled or beaten down area was found. It was described in evidence as indicating that a person had stood or sat there for some time.
Tracks of a man and a woman were found leading from Lacie's car. At one point a fence had been pushed down and on this fence a piece of cloth, later identified as being of the same color and material as the dress Lacie was wearing, was found snagged on the fence. When she was later found it was shown that a piece of the dress worn by Lacie was torn out.
The tracks led to another spot where there were signs of a struggle or scuffle. The tracks then led to the bank of the Sante Fe River at a place called Johnson's Hole. At this place the banks of the river were steep and about eight feet above the water level.
A short distance downstream Lacie's body was found in the water engaged in a tree which had fallen into the stream. The evidence shows her death to have been caused by drowning.
Defendant, who had taken part in the search and who was present when Lacie's body was discovered, was taken into custody at the scene by a Deputy Sheriff who told defendant that the authorities wished to question him about the case and that he was a suspect in the case.
The Deputy Sheriff, Mr. Sweat, and Mr. Deckle, one of those who had engaged in the search, got into the front seat of the deputy's car with the defendant on the rear seat.
According to Deputy Sweat's testimony at the trial the following events transpired on the way to the jail: he asked the defendant if he knew anything about the case to which defendant replied that he did not. Thereafter, the Deputy said:
"John, we have enough information on you we could have picked you up last night, so you just as well get right and tell us what you know about the case, it will save us a lot of trouble."
defendant then told the deputy and Mr. Deckle that he did know something about it; that he had waited in the bushes near the gate near Lacie's home; that when she got out of her car, opened the gate and drove her car through, he came out of the bushes "taken her and wronged her and carried her to the river to the Johnson Hole"; that the deputy stopped the car and put handcuffs on the defendant and took him to the jail; that the defendant said he wanted to talk to the Sheriff and the State Attorney who were called by the deputy; that when the Sheriff and the State Attorney arrived defendant told them he wanted to make a statement; that a court reporter was called and when she arrived the defendant did make a statement; that the defendant was offered no hope of reward or escape from punishment, *19 was not threatened or abused in any way and that he made the first statement to him and Mr. Deckle and the later statement to the Sheriff and State Attorney freely and voluntarily. No objection was made by defendant to the testimony of Deputy Sweat.
The statement made by defendant to the Sheriff and State Attorney was reduced to writing but was not signed by defendant. In this statement defendant told essentially the same story as recited by Deputy Sweat, but in greater detail. In the last statement he stated that he had forced Lacie to submit to him at knife point and that he had made her go to the river bank and had pushed her in.
After defendant made his statement to the Sheriff and State Attorney he agreed to go with them to the scene of the crime and re-enact it for them, which was done. Following this he took them to an area where a pocketbook, identified as belonging to Lacie, was found. According to the testimony of the Sheriff the defendant stated that he had removed Seven Dollars from the pocketbook before throwing it in the bushes. The Sheriff testified as to the re-enactment of the crime and his testimony, in substance, coincided with the statement of the defendant as transcribed and the testimony of Deputy Sweat in which he repeated the statement made to him by defendant.
Defendant raises four questions on appeal.
In the first question defendant, a negro, says he was denied equal protection and due process of law, contrary to the Federal Constitution, in that members of his race were unlawfully excluded from the grand jury which indicted him and the petit jury before which he was tried and convicted.
This question was raised for the first time in defendant's assignments of error, and is argued in defendant's brief. On oral argument before this Court, defendant's counsel presented affidavits which state that there are no negro voters in Union County, in which County the defendant was indicted and tried.
We agree with the State, which contends that we cannot now consider the matters raised by defendant in his first question. Section 905.05, F.S.A. decrees that no objection to a grand jury may be raised by plea or otherwise after the grand jurors have been empaneled and sworn. It is true that in State v. Lewis, 1943, 152 Fla. 178, 11 So.2d 337 this Court said that "time does not run before the indictment is found", but it said further at page 339 of 11 So.2d:
"* * * We do not set aside the rule previously enunciated by this Court, that issues of this kind must be seasonably presented and a ruling on them secured * * *."
Therefore, as pointed out by the State, no ruling having been secured by the defendant by the trial court as to the composition of either the grand jury or the petit jury, there is no action, request, or ruling had or made in the proceedings below properly before us for review. It is to be noted here that the defendant does not contend that negroes were arbitrarily, systematically or unlawfully excluded from the two juries because of their race, rather the affidavits presented merely reflect that there were no negro voters in the subject County, and no negroes on the juries.
Defendant next questions a charge given to the jury in the following words:
"And the court instructs you that a homicide immediately following the commission of one of the crimes just enumerated [those crimes enumerated included rape], for the purpose of concealment, will be deemed to have been committed in the perpetration thereof."
This charge followed immediately a charge in which the court instructed the jury that:
"The unlawful killing of a human being, when perpetrated from a premeditated *20 design to effect the death of the person killed or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, abominable and detestable crime against nature or kidnapping, shall be murder in the first degree." [This charge tracks Sec. 782.04, F.S.A.]
The defendant contends that the charge objected to by him was erroneous and harmful because "there was no premeditation proven and if there was any rape preceding the drowning of Lacie it had long been consummated prior to the drowning."
The defendant was charged in the indictment only with effecting the unlawful death of Lacie by drowning and by premeditated design, not with murder in the perpetration or attempted perpetration of rape.
However, in the opening statement the State announced that it would prove that defendant committed murder either in the perpetration or attempted perpetration of rape, or by premeditated design.
We have carefully reviewed the record and find sufficient evidence to support a finding by the jury that the killing was by premeditated design. In view of this the charge complained of cannot be said to be harmful, even if it were erroneous.
We make it clear, however, that we do not hold the charge to have been erroneous under the facts of this case. While we apparently have not decided the question previously in this State such a charge has been upheld in at least one other jurisdiction. See Commonwealth v. Osman, 1933, 284 Mass. 421, 188 N.E. 226. Also see 40 C.J.S. Homicide § 21(b), p. 870.
The third point raised by defendant submits that the trial court erred in admitting into evidence the transcript of the statement made by the defendant to the Sheriff and the State Attorney and testimony of the Sheriff and others as to what was said and done at the re-enactment of the crime by the defendant.
The defendant testified that he was threatened with lynching unless he confessed and that he made the statements attributed to him out of fear.
First, it is to be noted that the testimony of Deputy Sweat in which he related the statements made by defendant while enroute from the scene of the crime to the jail were not objected to and are not now involved in this point on appeal.
Defendant took the stand in his own behalf. Among other things he testified that he made the statement to the Sheriff and State Attorney because:
"Well I did it because they threatened to beat me, told me they was going to take me out and lynch me. Mr. Sweat told me when they put the handcuffs on me when they stopped down there they would.
"They [told me they] would take me out that night and lynch me; if I did not tell something another I would be sorry of it."
He further testified he made the statement because he was afraid.
On cross examination defendant was asked the following questions and answered as follows:
"Q. After you got in the car [with Deputy Sweat] did anybody try to follow you and give you any trouble? A. Not as I knows of. I didn't pay no attention.

"Q. Did you see anybody trying to lynch you or take advantage of you? Or hit you? A. No, sir, I heard Mr. Sweat say something about it, but I didn't pay no attention.

"Q. Did anybody in the car strike you? A. No, sir."
By his own admission defendant was not abused or tortured in any way. He says *21 only that he confessed because of fear of the threat of lynching or beating by Deputy Sweat. However, when asked about these threats, the defendant said "* * * I didn't pay no attention."
Mr. Deckle who was riding in the car with Deputy Sweat and the defendant when the threats were allegedly made testified that he remembered little of what was said by Deputy Sweat to the defendant. He stated that he did not recall the deputy offering defendant any reward and believed he would have remembered had any been offered. He did not recall that the deputy had told defendant that "if he knew anything he had better talk to save some trouble." He did recall that the deputy asked defendant about his connection with the case and that "when he admitted it then he pulled over and placed the handcuffs on him."
In addition to the statement made by Deputy Sweat as set forth in the first part of this opinion there was testimony by the deputy indicating that he may also have said to defendant "it would be easier on you", or "the easiest way would be to tell it", or "it will save holding you any length of time", or "it will save holding you any length of time and questioning you." There is no indication that the deputy in any way explained to defendant why it would be best to make a statement or tell the truth so as to connect the deputy's statements with a threat or hope of reward.
Before allowing the transcribed statement and the testimony concerning the re-enactment of the crime into evidence the able trial judge carefully considered the voluntary nature of the statements and the surrounding conditions and circumstances and concluded they were admissible as freely and voluntarily made.
As we see it, this third question resolves itself into a determination of whether or not the statements admitted to have been made by Deputy Sweat to the defendant on the ride from the scene of the crime to the jail were such threats or offer of hope or reward as to render defendant's statements involuntary.
Unquestionably, to be admissible in evidence a confession, and statements in the nature thereof, must be freely and voluntarily made. This requires that at the time of the making the confession the mind of the defendant be free to act uninfluenced by either hope or fear. The confession should be excluded if the attending circumstances, or the declarations of those present at the making of the confession, are calculated to delude the prisoner as to his true position, or to exert improper and undue influence over his mind. Simon v. State, 1853, 5 Fla. 285, 296; Harrison v. State, 1943, 152 Fla. 86, 12 So.2d 307.
If Deputy Sweat's remarks to the defendant are to be construed as a mere suggestion to him that he confess, then such suggestion cannot be taken to be a promise which will exclude the confession. Steele v. State, 1888, 83 Ala. 20, 3 So. 547 (defendant was merely told that he must tell a straighter tale if he wished to be believed); People v. Pugh, 1951, 409 Ill. 584, 100 N.E.2d 909; Davis v. People, 1957, 10 Ill.2d 430, 140 N.E.2d 675, certiorari denied 355 U.S. 820, 78 S.Ct. 25, 2 L.Ed.2d 35; State v. Robuck, 1952, 126 Mont. 302, 248 P.2d 817; and State v. Richard, 1953, 223 La. 674, 66 So.2d 589. In the last case the reviewing court held that the test in such cases was whether the inducement was of a nature calculated, under the circumstances, to induce a confession irrespective of its truth or falsity. The court further stated that a mere exhortation or adjuration to speak the truth will not exclude a confession, but that where such adjuration is accompanied by an expression that it would be better for the accused to tell the truth, some courts have refused to admit such confession.
In 20 Am.Jur., Evidence, § 508 the following appears:
"The indefinite hope of benefit held out by advice to the accused that it *22 would be better for him if he would confess has sometimes been held sufficient to render resulting confessions involuntary. * * * But the sounder rule is that a confession is not rendered involuntary by advice to the accused that it would be better for him to confess if guilty, and if not guilty, to stand firm. * * *
"There is some difference of opinion as to whether saying to the accused that it would be better for him to tell the truth or to confess constitutes such an inducement as will make a confession obtained in consequence of it involuntary. In England, the tendency of the courts is to regard advice to tell the truth or to confess or tell all about the crime, when given by a person in authority, as sufficient to render involuntary any resulting confession, and there is some support for this view in the United States. * * * The prevailing opinion, however, is that telling the accused that it would be better for him to speak or tell the truth does not furnish any inducement, or a sufficient inducement, to render objectionable a confession thereby obtained, unless threats or promises are applied."
The following appears in 2 Wharton's Criminal Evidence, § 368 (12th ed. 1955):
"Whether mere advice to an accused to confess is sufficient to render the confession that follows it involuntary seems to depend upon whether from the advice the accused could gather some hope of benefit by making the confession. Thus, advice to the accused under arrest, given by the officer, to the effect that if he knew anything he had better tell it, renders the confession involuntary."
In III Wigmore on Evidence, § 838 (3rd ed. 1940) it is said:
"Is the indefinite and elusive assurance of advantage contained in the phrase `you had better confess' in any degree calculated to induce a false confession? What tangible attraction is there in it? It is an exhortation, to be sure, which might turn the balance, in the breast of a guilty person, between silence and confession; but with an innocent man, that is too extaordinary a supposition to justify any evidentiary rule of exclusion. Nevertheless, this has always been held (under circumstances of greater or less unreason) to be a vitiating inducement  upon the rule, of course (ante § 825), that `any inducement, however slight,' is sufficient to exclude. In a given case the exclusion may occasionally not be improper under all the circumstances; but that such a phrase, or its equivalent, should in itself and as a rule operate to vitiate the confession is incorrect on principle and in common sense."
As can be ascertained from the above comments, some different results are reached in the various jurisdictions when the accused's confession is prompted by an admonition, request or suggestion to confess. However, in the instant case it cannot seriously be maintained that the admonition to "get right and tell us what you know about this case" was an admonition to confess. Rather, it was more a request for the accused to tell the truth.
It was noted that according to 20 Am. Jur., Evidence, § 508, supra, the prevailing opinion is that telling the accused that it would be better for him to tell the truth is not inducement, or sufficient inducement, which renders a resulting confession involuntary.
Other authorities are in agreement.
"A confession is not rendered involuntary merely because defendant was told that he should tell the truth or that it would be better for him to tell the truth." 2 Underhill's Criminal Evidence, § 388 (5th ed. 1956).
"Adjurations unaccompanied by a threat or promise are not sufficient to *23 render a confession involuntary. A mere adjuration to speak the truth does not vitiate a confession when neither threats nor promises are employed. * * *
"A normal, innocent person ordinarily would not accuse himself falsely on a mere adjuration that it would be better to tell the truth, but each case must stand upon its special circumstance.
* * * * * *
"When the adjuration is accompanied by an inducement, either by way of threat or promise, it renders the confession inadmissible. For example, the mere statement that it would be better to tell the truth is not an inducement rendering a confession involuntary." 2 Wharton's Criminal Evidence, § 367 (12th ed. 1955). See also People v. Heide, 1922, 302 Ill. 624, 135 N.E. 77. "On principle, the advice by any person whatever that it would be better to tell the truth cannot possibly vitiate the confession, since by hypothesis the worst that it can evoke is the truth, and there is thus no risk of accepting a false confession. * * *" III Wigmore on Evidence, § 832 (3rd ed. 1940).
In the above cited section Wigmore comments, in a footnote, that many courts which exclude a confession where the accused has been told "it's best to tell the truth" do so, apparently, upon the theory the accused reasoned the statement to mean that, whether innocent or not, it would in some way better his condition to tell a different story.
Some courts have expressly ruled that for a police officer merely to ask or to tell a person accused of crime to tell the truth is advice only, and not a threat. Commonwealth v. Preece, 1885, 140 Mass. 276, 5 N.E. 494 (although the court stated it would have ruled the confession involuntary had the accused been told he had "better" tell the truth. See also Edwards v. State, 1950, 194 Md. 387, 71 A.2d 487, 492.); People v. Randazzio, 1909, 194 N.Y. 147, 87 N.E. 112; Watkins v. State, 1945, 199 Ga. 81, 33 S.E.2d 325.
This Court, in Thomas v. State, Fla. 1957, 92 So.2d 621, 623, certiorari denied 354 U.S. 925, 77 S.Ct. 1389, 1 L.Ed.2d 1440, where a confession was made to an assistant state attorney after one hour of questioning in the jail, said:
"* * * Exhortations to tell the truth, while under arrest, absent duress, threats, compulsion, hope of reward or benefit, do not render a statement involuntary. * * *"
In that case the accused claimed that the assistant state attorney repeatedly called him a liar and exhorted him to tell the truth. This Court, concerning the contention this conduct was harmful, said that it is true that it was a crude and very undignified method by which to conduct such an examination. but it was not harmful. See also Meyer v. State, 1925, 89 Fla. 261, 103 So. 630.
Consequently, if Sweat's remarks to defendant are to be merely considered an adjuration to tell the truth the resulting confession was not rendered involuntary thereby.
However, it has been held that such adjurations to tell the truth, if connected with suggestions of a benefit, made the resulting confession inadmissible. People v. Klyczek, 1923, 307 Ill. 150, 138 N.E. 275; State v. Richard, 1953, 223 La. 674, 66 So.2d 589, supra. In Murphy v. United States, 7 Cir., 1923, 285 F. 801, certiorari denied 261 U.S. 617, 43 S.Ct. 362, 67 L.Ed. 829, it was held that such requests to tell the truth, coupled with other statements, may make the confession inadmissible.
Whether the specific language used amounts to a threat or promise of benefit depends upon the circumstances in which it is used and on warrantable inferences drawn from the language and *24 circumstances. The threat must be of such a character as to render it doubtful whether the confession should be relied upon as worthy of credit. 22 C.J.S. Criminal Law § 826. The confession may be untrustworthy because it has been associated with an attraction too strong to resist. III Wigmore on Evidence, § 824.
Wigmore, in § 831, further says:
"The current rules or tests, for determining what kind of inducement suffices to exclude, are three * * *:
"(1) the first is, was the inducement of a nature calculated under the circumstances to induce a confession irrespective of its truth or falsity?
"* * *
"It has been seen (ante, § 824) that the first test is the only rational and correct one."
Various results have been reached, however, in the several courts.
Where the defendant was told if he came clean and told the truth it would have a beneficial effect on him, the court held the confession inadmissible. It was definitely implied to the defendant that the court would be lighter on him if he would tell the truth. Hammer v. State, 1925, 102 Tex.Cr.R. 224, 277 S.W. 392. The confession was also found to be inadmissible in Kier v. State, 1957, 213 Md. 556, 132 A.2d 494, where the defendant while nude in the presence of the questioning officer and a physician, was told the physician would desist in his physical examination of the defendant in the search for evidence, if he would tell the truth.
Where the accused was told that making a confession would save him some time and that he should tell the truth, the court held such remarks not to be promises rendering the confession inadmissible. Anderson v. State, 1933, 205 Ind. 607, 186 N.E. 316. And in People v. Kennedy, 1899, 159 N.Y. 346, 54 N.E. 51, 54, where there was no other evidence but that the confession was voluntary and made with understanding, the court held the confession admissible where the accused was told "he could just as well tell him the truth, as it would save him [accused] a lot of trouble."
Further, where the arresting officer's statement was that they had the goods on the defendant and that he had just as well come clean, the court, in the following case, held such statement not to render the confession involuntary. People v. Castello, 1924, 194 Cal. 595, 229 Pa. 855.
Yet the Louisiana Court held the confession to be involuntary where the accused was told "the best thing to do is to tell the truth because we have the evidence against you." State v. Ross, 1947, 212 La. 405, 31 So.2d 842, 845.
In State v. Matthews, 1950, 231 N.C. 617, 58 S.E.2d 625, 627, the accused was told "we knew it was you" and "you had better come clean". The court found this did not invalidate the confession, saying there was no coercion, no wearing down by repeated questioning, nor no threats or torture to induce a confession "as the purchase price of surcease from pain or weariness."
In the instant case, defendant's uncorroborated contention was that his confession was prompted by a threat of a lynching by Deputy Sweat. Yet at the trial he testified that no one followed them when they were enroute to the jail and no one threatened to lynch or hit him, except that Deputy Sweat said something about it, "but I didn't pay no attention." Therefore, even if defendant's testimony be believed, by his own admission the alleged threat did not influence his thinking.
Remembering that the voluntariness of a confession is for the lower court's determination, we have searched the record and weighed the facts of this case in the endeavor to discover whether clear error on the part of the lower court in such determination exists. We find ourselves in *25 agreement with the court in State v. Matthews, supra, in that we find no coercion inducing the defendant's confession to Deputy Sweat "as the purchase price of surcease from pain or weariness." There is no clear showing that the inducement, if any, contained in Sweat's remarks was of a nature calculated, under the circumstances, to induce a confession irrespective of its truth or falsity. There was no showing that a false confession would have been more desirable to defendant than some alternative. Sweat's remarks do not appear to have been designed to delude the defendant as to his true position. We therefore conclude that Deputy Sweat's conduct does not render inadmissible either the defendant's confession or the testimony relating to the re-enactment of the crime.
In so holding we recognize that on relatively the same facts, as far as the "inducing" statements are concerned, some courts have held differently. Yet we believe from all the circumstances of this case our conclusion is the proper one. We are decidedly of the opinion that no clear abuse of the discretion of the lower court in so finding has been shown.
When Sweat arrived at the jail with the defendant the Sheriff and the State Attorney were informed that the defendant had confessed guilt and was ready to make a statement. A court reporter was sent for but did not arrive until an hour and a half later, or longer. When she arrived, the State Attorney proceeded to question the defendant and the examination was recorded by the reporter. The resulting statement, which was subsequently read before the court and jury at the trial, was not read back to the defendant, nor did he sign nor adopt it.
As to the time subsequent to defendant's arrival at the jail and prior to the giving of his statement, the record reflects no evidence of any conduct or coercion which could have rendered defendant's confession inadmissible, with one possible exception. Defendant's confession, or statement, consisted largely of answers to questions propounded to him by the State Attorney. These questions were often clearly leading. The question therefore arises whether the absence of spontaneity in defendant's statement clothed it with an involuntary nature.
In the case of Meyer v. State, 1925, 89 Fla. 261, 103 So. 630, 632, supra, where the State Attorney had made unwarranted and prejudicial remarks concerning the defendant to the jury a dissenting justice said:
"Where a state attorney indulges in such language, and where testimony of alleged confessions are admitted without a proper predicate, and where the word of the sheriff, who is interested in securing a conviction, and the word of the prisoner, who is interested in securing his acquittal, are in conflict, and where the essentials to establish that a confession was voluntary are not established, and where the testimony of a confession adduced by questions that contain all the essential elements of the testimony, to which the witness has merely to reply, `Yes,' or `I did,' such an alleged confession is far from voluntary and should not be admitted in evidence."
However, the majority of the court ruled that in view of the defendant's own testimony and other circumstances in evidence, the fact that proper predicate was not laid for testimony of a confession was not harmful to the defendant. His conviction was affirmed.
The following appears in 20 Am.Jur. Evidence, § 496:
"A confession is regarded as voluntary when it proceeds from the spontaneous expressions of the mind, free from the influence of any extraneous disturbing cause, and each case is to be governed by the particular circumstances surrounding it."
*26 and, in § 497:
"A confession does not have to proceed wholly at the suggestion of the accused himself in order to be voluntary. * * * The word `voluntary' as applied to confessions does not, therefore, mean spontaneous. * * *"
and further, in § 500:
"Spontaneity is not necessary to the voluntariness of a confession, and in this country it is universally recognized that a confession is not rendered inadmissible in evidence merely because it was elicited by inquiries and questions addressed to the accused."
See also People v. Goard, 1957, 11 Ill.2d 495, 144 N.E.2d 603; 2 Wharton's Criminal Evidence, § 349 (12th ed. 1955); 2 Underhill's Criminal Evidence, § 386 (5th ed. 1956).
This Court in Graham v. State, Fla. 1956, 91 So.2d 662, 664 said:
"Making a confession while in custody is a circumstance that may be considered in judging the freeness and voluntariness of the confession but it is by no means determinative of the matter. * * *"
This Court has also ruled, in Nickels v. State, 1925, 90 Fla. 659, 106 So. 479, 483:
"The law is well settled that when an extrajudicial confession is made in conformity with the rule above stated, it is admissible, although it may not be the spontaneous utterance of the accused. The fact that the confession was obtained by questioning the prisoner will not alone exclude it, even though some of the questions be leading and assume guilt, if the confession in fact emanates from the free will of the accused and is without inducement of hope, fear, or other illegal influence. * * *"
See also Brown v. State, 1938, 135 Fla. 30, 184 So. 518.
Our conclusion is that no error has been made to appear in the admission by the trial court of defendant's statement or of testimony relating to his re-enactment of the crime, which followed the giving of his statement to the State Attorney.
Finally, defendant argues that the evidence was insufficient to support a conviction. He contends that there must be proof of the corpus delicti independent of his confession.
It is true that before a confession should be received in evidence there must be some independent proof of the corpus delicti. Parrish v. State, 1925, 90 Fla. 25, 105 So. 130; Keir v. State, 1943, 152 Fla. 389, 11 So.2d 886. There should at least be some additional substantial evidence, either direct or circumstantial. Tucker v. State, 1912, 64 Fla. 518, 59 So. 941. The corpus delicti need not be proved beyond a reasonable doubt, but it is enough if the evidence tends to show that the crime was committed. McElveen v. State, Fla. 1954, 72 So.2d 785; Graham v. State, 1943, 153 Fla. 807, 16 So.2d 59. The only question is whether the evidence of the corpus delicti is prima facie sufficient to authorize the admission of the confession. Nickels v. State, 1925, 90 Fla. 659, 106 So. 479, supra; Graham v. State, supra. See Annotation: 45 A.L.R.2d 1316 (1954).
From the facts recited within this opinion, which facts were before the court, we feel that the court, whose province it was to determine the sufficiency of the proof of the corpus delicti, was entitled to find the necessary prima facie existence of the corpus delicti.
No reversible error has been made to appear, and our review of the record reveals sufficient evidence upon which the jury's conviction could be based and should be upheld. Accordingly, the judgment appealed from is hereby affirmed.
TERRELL, C.J., and THOMAS, HOBSON and ROBERTS, JJ., concur.