BROWNING, J.
The State’s petition charged that between July 9, 2001, and April 7, 2003, J.G. (Appellant), a juvenile, “did commit a sexual battery upon, or in an attempt to commit sexual battery injure the sexual organs of [D.E.], a person less than 12 years of age, by placing his penis in or upon the anus of [D.E.].” Appellant filed a motion to suppress oral statements, admissions, and confessions on the grounds they had been obtained in violation of his federal and state constitutional rights. Finding that Appellant’s oral statements to the police were voluntarily given and that he was not coerced, the trial court denied the motion after a hearing. Appellant reserved the right to appeal the denial of the motion to suppress. Appellant’s confession was introduced as substantive evidence against him. The trial court adjudicated Appellant delinquent of sexual battery and, pursuant to the parties’ stipulation, considered the evidence presented at the adjudicatory hearing to support its finding that Appellant had violated the terms of his probation. The court revoked Appellant’s probation and committed him to a high-risk residential program. Appellant appeals the adjudication of delinquency and the revocation of his probation. Because the trial court erred as a matter of law in *918 finding that Appellant’s written waiver of Miranda[1] rights was knowing, intelligent, and voluntary; and that his oral confession was freely and voluntarily made, the denial of the motion to suppress was erroneous. Absent a showing by the State that the error was harmless beyond a reasonable doubt, we are constrained to reverse the adjudication of delinquency and the probation revocation order and to remand for further proceedings. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
The trial judge acknowledged on the record that “the crucial evidence” in this case is Appellant’s confession and testimony. Appellant argued in the trial court and on appeal that the police failed to comply with the parental notification statute, that his waiver of rights was invalid, and that his oral statements to the police were not freely, voluntarily given.
“The State bears the burden of proving that the waiver of the Miranda rights was knowing, intelligent and voluntary.” Ramirez v. State, 739 So.2d 568, 575 (Fla.1999). Likewise, the State has the burden to show, by a preponderance of the evidence, that Appellant’s oral confession was freely and voluntarily made. See Brewer v. State, 386 So.2d 232, 236 (Fla.1980). “[T]he ultimate issue of voluntariness is a legal rather than factual question.” Ramirez, 739 So.2d at 575. Therefore, we have, de novo review of these legal issues. See Brancaccio v. State, 773 So.2d 582, 583 (Fla. 4th DCA 2000). The following pertinent facts surrounding Appellant’s receiving the Miranda rights and giving an oral confession were presented at the suppression hearing.

Facts

During the period in question, Appellant’s mother was away in rehabilitation, and his father was not present in Appellant’s day-to-day life. The victim’s mother, Ms. McBride (who is Appellant’s aunt) testified that on April 6, 2003, Appellant spent the night at the apartment where Ms. McBride and her daughter (who is Appellant’s cousin) lived. On various occasions, Appellant had stayed in the living room at Ms. McBride’s residence, and sometimes the victim had stayed at Appellant’s residence. On April 6, Appellant was not expected to stay the night at Ms. McBride’s place, but he did so because his grandmother’s car broke down, she could not pick him up, and his sister was not at home. According to Ms. McBride, later that same night, Appellant and the young victim were “acting strange.” When Ms. McBride asked the victim whether anyone had ever “messed” with her, the victim indicated that once, Appellant had pushed her down and had engaged in inappropriate sexual behavior with her. Ms. Hocker, who was Ms. McBride’s lesbian partner, asked the victim whether anything else had happened. The victim answered “No” and did not want to talk about it anymore. Ms. McBride then dialed 911 but was too upset to talk. Instead, Ms. Hocker talked to the authorities. The police drove Appellant to the police station around 10:00-11:00 P.M. in a patrol car while the victim, accompanied by Ms. McBride and Ms. Hocker, followed.
Upon arrival at the police station, Ms. McBride talked to Detective White and to someone from the Child Protection Team. The detective asked Ms. McBride to sit in on the interview with Appellant because the detective wanted another adult present. When Ms. McBride said she was too upset to sit through the questioning of Appellant, the detective asked Ms. Hocker to sit in instead. According to Ms. McBride, when the questioning of Appel *919 lant was over, Ms. Hocker came out of the interview room and asked Ms. McBride to tell Appellant that she loved him and did not hate him. As Appellant cried and remarked that everyone was going to hate him, Ms. McBride walked to the doorway of the interview room and told Appellant: “I don’t hate you, I still love you.” She testified that Appellant had not looked sleepy, hurt, afraid, or disoriented at the time. On cross-examination, Ms. McBride testified that she had told the detective that Ms. McBride’s mother was Appellant’s guardian and custodian.
Ms. Hocker, age 23, testified that the victim, her goddaughter, is like a daughter. Ms. Hocker had known Ms. McBride and the victim for a year and a half or less. The witness testified that at the commencement of the interview late that night or early on the morning of April 7, Detective White handed Appellant a piece of paper with Miranda rights and had Appellant read it aloud. The detective asked whether Appellant understood what he had read, and Appellant answered affirmatively and was instructed to sign the form. The lighting in the interview room was “normal.” Ms. Hocker testified that Appellant’s rights were not actually read to him.
According to Ms. Hocker, questioning began with whether Appellant had any idea why he was at the police station, and he answered “No.” When the detective asked: “So you don’t know why you’re here?” Appellant answered: “I think it’s something about me touching my cousin.” When the detective asked several times whether Appellant had touched his cousin, Appellant kept answering “No.” When Ms. Hocker asked him the same question, Appellant again said “No.” For about thirty minutes, he continued to deny having inappropriately touched his cousin.
The witness testified that Appellant’s answers changed upon a new line of questioning. Specifically, Ms. Hocker said to him: “If I was to show you a videotape with you touching [the victim], you would say it wasn’t you.” Appellant continued to deny any wrongdoing. When Appellant asked whether “you” had videotapes, Detective White, responding to the new direction in questioning initiated by Ms. Hocker, answered ‘Tes.” When Appellant asked twice whether he could see the videotapes, the detective said “No,” stating that the videotapes were “in evidence.” When Appellant asked whether he could go home if he told the truth, the detective answered that it was not up to her to decide. At some point during the interview, the detective told Appellant that she thought he was lying. Ms. Hocker testified that Appellant eventually broke down, said he would tell the truth, and admitted entering the victim’s anus.
According to Ms. Hocker, Appellant then started crying for the first time and said that his grandmother and his aunt were going to hate him. Ms. Hocker said that she had reassured Appellant that everything was going to be O.K. Ms. Hocker testified that although she told Appellant that he was wrong to do what he had done, she reassured him that nobody was going to hate him. At that point, Ms. Hocker had left the interview room and asked Ms. McBride to tell Appellant that she (Ms. McBride) did not hate him. Ms. McBride complied.
Ms. Hocker denied ever becoming confrontational during Appellant’s interview. She testified that Appellant had seemed alert and did not look sleepy or indicate that he was scared, hungry, or mistreated. Ms. Hocker said that no one ever threatened Appellant, called him names, or made promises in exchange for his admissions. Ms. Hocker estimated that the interview lasted close to two hours. Appellant gave his confession about thirty minutes into *920 the questioning. On cross-examination, Ms. Hoeker acknowledged (over an objection questioning relevance) having been sexually abused by a relative during childhood.
Officer Crotty, of the Jacksonville Sheriffs Office, testified that he had driven Appellant to the police station around 12:30 A.M. and placed him in the interview room, which had normal fluorescent lighting. The room is about eight feet square and has a table and several office-type chairs. Appellant sat in the interview room for about 2-^ hours before the questioning commenced. He was in the room for a total of three or four hours before being taken to the juvenile assessment center. The officer said that he had remained in an office immediately outside the interview room and never heard any arguing or commotion inside. After the interview, the officer arrested Appellant around 5:00 A.M. The arrest docket listed the grandmother, Ms. Anderson, as Appellant’s guardian. The officer testified that he had received Ms. Anderson’s name, address, and telephone number from the two complainants, one of whom he understood to be Appellant’s custodial guardian and relative with whom Appellant was staying. No officer made any attempt to notify Appellant’s grandmother.
Detective White, of the Jacksonville Sheriffs Office sex-crimes unit, testified that Officer Crotty brought Appellant to the police station around 12:25 A.M. on April 7. Appellant was placed alone, and without handcuffs, in the interview room until around 3:00 A.M. While waiting there, Appellant was allowed to use the restroom and was offered snacks or beverages three times. Detective White interviewed the victim in another room. On the date of the interviews, Detective White had worked in the sex-crimes unit about three weeks.
The detective testified that at 3:00 A.M., she asked Ms. Hoeker (whom she believed to be Appellant’s godmother) if she wanted to sit in the interview room so that another adult would be present during the questioning of Appellant. Ms. McBride had indicated that Ms. Hoeker, who had a better talking relationship with Appellant, should be there. The detective testified that Appellant sat in a chair and looked awake and alert when the interview began.
Detective White testified that she had asked Appellant to read aloud each sentence on his Miranda rights form. The detective testified that Appellant had orally indicated that he understood his rights. Appellant, Detective White, and Ms. Hoeker all signed at the bottom of the waiver of rights form. Appellant’s interview was not audiotaped or videotaped. The detective acknowledged that Ms. Hoeker had participated in the questioning. Initially, Appellant denied the allegations. As they started discussing details as to why Appellant was there, he stated that he had never “messed” with the victim. According to the detective, Appellant first stopped denying the allegations 15-20 minutes into the interview, and he confessed 50-60 minutes after the interview commenced. The detective left the interview room around 4:15 A.M.
Detective White testified that Appellant changed his story, and gave his confession, only after Ms. Hoeker mentioned the purported videotapes made in the living room, a comment that the detective “let her go with.” The detective conceded she may have told Appellant that he could not see the videotapes because they were “in evidence.” The detective testified that Appellant admitted having placed his penis between the victim’s thighs. When the detective asked what pleasure there was in that, Appellant admitted penetrating the victim’s anus. Detective White testified *921 that Appellant did not cry during the interview. When the detective left the interview room, Ms. Hocker sat awhile with Appellant and then was joined by Ms. McBride. The detective testified that no promises or threats were made during the interview, and Appellant never complained of being mistreated, sleepy, or tired. No confrontation arose in the detective’s presence.
On recall, Ms. McBride testified that she had not tried to call her mother (Appellant’s grandmother) on the night and early morning in question because her mother’s telephone was not working. Ms. McBride said that she told the officer the grandmother was keeping Appellant at the time, and she provided the officer with the grandmother’s address. Ms. McBride testified that Appellant lived with his grandmother and occasionally stayed at Ms. McBride’s residence.
Appellant’s grandmother testified that she was the guardian with whom Appellant was residing on April 6, 2003. She denied that Appellant ever spent the night at Ms. McBride’s house.
Appellant testified that he had felt sleepy in the interview room and that he had told this to Detective White. Appellant testified that he had been asleep for at least two hours when the detective walked into the room before the questioning.
On second recall, Ms. McBride testified that she had told Detective White that Appellant and Ms. Hocker were friends who talked. Ms. McBride denied telling the detective that Ms. Hocker was Appellant’s godmother. On third recall, Ms. McBride testified that after leaving the police station, she went to her mother’s apartment and told her what had happened.

Law: Waiver of Rights

The United States and Florida Constitutions provide that an individual shall' not be “compelled in any criminal matter” to be a witness against himself or herself. U.S. Const, amends. V & XIV; Art: I, § 9, Fla. Const. This constitutional guarantee “is fully applicable during a period of custodial interrogation.” Miranda, 384 U.S. at 460, 86 S.Ct. 1602; Ramirez, 739 So.2d at 572-73. In his motion to suppress, Appellant asserted that his oral statements should be suppressed because they were obtained in violation of his federal and state constitutional privilege against self-incrimination, his right to counsel, and his right to be free from unreasonable searches and seizures. U.S. Const, amends! IV, V, VI & XIV; Art. I, §§ 9, 12 & 16, Fla. Const.; Miranda, 384 U.S. at 442, 86 S.Ct. 1602; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He contended also that his oral statements were not freely and voluntarily given but, instead, were the product of inappropriate governmental compulsion, intimidation, threats, promises, and/or inducements.
In Miranda, the United States Supreme Court “established certain procedural safeguards designed to protect the rights of an accused, under the Fifth and Fourteenth Amendments, to be free from compelled self-incrimination during custodial interrogation.” Fare v. Michael C., 442 U.S. 707, 709, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Specifically, the Court set out a bright-line rule to safeguard against compulsion and the coercive nature and atmosphere of custodial interrogation and “assure that the individual’s right to choose between silence and speech remains unfettered throughout the interrogation process.” Miranda, 384 U.S. at 469, 86 S.Ct. 1602. The Court said “[t]he requirement of warnings and waiver of *922 rights is a fundamental [one] with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.” Id. at 476, 86 S.Ct. 1602. The Court described “custodial interrogation” as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Id. at 444, 86 S.Ct. 1602; see Traylor v. State, 596 So.2d 957, 966 n. 17 (Fla.1992). “Custody for purposes of Miranda encompasses not only formal arrest, but any restraint on freedom of movement of the degree associated with formal arrest.” Ramirez, 739 So.2d at 573. Construing section 9 of the Florida Constitution, the Supreme Court of Florida has stated that “[a] person is in custody ... if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest.” Traylor, 596 So.2d at 966 n. 16. Whether a suspect is “in custody” presents a mixed question of fact and law. See Thompson v. Keohane, 516 U.S. 99, 106-07, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); Ramirez, 739 So.2d at 574. Florida courts have embraced a four-part test in determining whether a reasonable person in the suspect’s position would consider himself “in custody”:
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Id.; Mansfield v. State, 758 So.2d 636, 644 (Fla.2000). For purposes of section 9 of the Florida Constitution, “[i]nterrogation takes place ... when a person is subject to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response.” Traylor, 596 So.2d at 966 n. 17. The police drove Appellant to the station in a patrol car and took him to the interview room for questioning. He was a suspect because of the victim’s statements to Ms. McBride. After extended, specific questioning by a detective and Ms. Hocker during which Appellant repeatedly denied any wrongdoing, he was confronted with purported videotaped evidence of his acts and eventually confessed. Appellant was not informed that he was free to leave the place of questioning. The uncontroverted facts lead inescapably to the conclusion that Appellant was subject to custodial interrogation, thereby triggering Miranda concerns.
A defendant may waive Miranda rights “provided the waiver is made voluntarily, knowingly and intelligently.” Miranda, 384 U.S. at 444, 86 S.Ct. 1602. Juveniles are subject to Miranda protections. See Ramirez, 739 So.2d at 575-76; State v. S.L.W., 465 So.2d 1231, 1232 (Fla.1985). Whether Appellant validly waived his Miranda rights is to be determined according to the following general inquiry:
First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the “totality of the circumstances surrounding the interrogation” reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
*923 Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quoting Fare, 442 U.S. at 725, 99 S.Ct. 2560); see also Miranda, 384 U.S. at 444-45, 86 S.Ct. 1602; State v. Mallory, 670 So.2d 103, 106 (Fla. 1st DCA 1996). The Supreme Court of Florida in Ramirez, 739 So.2d at 568, set out certain specific factors that may be included under the Moran analysis in deciding whether a waiver of Miranda warnings is valid. The Ramirez court found the following factors relevant: 1) “the manner in which the Miranda rights were administered, including any cajoling or trickery”; 2) “the suspect’s age, experience, background and intelligence”; 3) “the fact that the suspect’s parents were not contacted and the juvenile was not given an opportunity to consult with his parents before questioning”; 4) “the fact that the questioning took place in the station house”; and 5) “the fact that the interrogators did not secure a written waiver of the Miranda rights at the outset.” Id. at 575-76.
The State had the burden to prove that Appellant’s waiver of Miranda rights was knowing, intelligent, and voluntary. See id. at 575. When, as in this case, the person is a juvenile, the State has a “heavy burden” to show a knowing, intelligent waiver of the privilege against self-inerimi-nation and the right to counsel. See Colorado v. Connelly, 479 U.S. 157, 167-68, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Just as the State had the burden to show a valid waiver of Miranda rights, it also had to prove that Appellant’s subsequent incriminating oral statements to the police were freely and voluntarily made, and not compelled. See Miranda, 384 U.S. at 442-44, 86 S.Ct. 1602; Ramirez, 739 So.2d at 573; Traylor, 596 So.2d at 964-65; Brancaccio, 773 So.2d at 583-84. We review de novo the ultimate issue of voluntariness as it relates to both the waiver of rights and the oral confession. See Miller v. Fenton, 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); Ramirez, 739 So.2d at 575.
Applying the two-pronged general analysis from Moran, 475 U.S. at 421, 106 S.Ct. 1135, as spelled out in Ramirez, 739 So.2d at 575-76, we must consider the totality of the circumstances in deciding whether Appellant validly waived his Miranda rights. Regarding how the Miranda rights were administered, Detective White testified that she gave Appellant an official, written constitutional rights form and asked him to read each sentence aloud. Ms. Hocker was present in the police interview room. The written form states in pertinent part:
You have the following rights under the United States Constitution:
• You do not have to make a statement or say anything.
• Anything you say can be used against you in court.
• You have the right to talk to a lawyer for advice before you make a statement or before any questions are asked of you, and to have the lawyer with you during any questioning.
• If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you wish.
• If you do answer questions, you have the right to stop answering questions at any time and consult with a lawyer.
According to the detective, after Appellant read the rights form, he expressly stated that he understood his rights, and he signed the waiver of rights form.
Although the actual wording of the written form may seem relatively simple and straightforward, the language embodies sophisticated “concepts of American criminal jurisprudence,” specifically, “the restraints society must observe consistent with the Federal Constitution in prosecuting individuals for crime.” Miranda, 384 *924 U.S. at 439, 86 S.Ct. 1602. Nothing in the record suggests that, at that stage of the proceedings, before the questioning began, any “intimidation, coercion, or deception” was used to induce Appellant to waive his rights. See Moran, 475 U.S. at 421, 106 S.Ct. 1135. However, whether the record established that Appellant was fully aware of “both the nature of the right being abandoned and the consequences of the decision to abandon it” is another matter altogether. See id.
Appellant was 13 years old and a seventh-grader on the date of the interview. He was enrolled in “exceptional student educational” (emotionally handicapped) courses and was described as “literate.” His second nine-week grading report shows Appellant had Fs in six of his seven classes. Appellant was familiar with the juvenile justice system. His Florida Department of Juvenile Justice Pre-Disposition Report lists a May 2002 investigation of lewd or lascivious molestation culminating in a January 2003 adjudication for the lesser-included offense of battery. He was placed on home detention and remained on probation in April 2003. Because Appellant’s long-term custodian (his grandmother) and his parents were not notified before the interview, he was denied any opportunity to consult with his immediate family before signing the waiver form and being questioned. Although Officer Crotty had received the name of the grandmother as Appellant’s custodian, Ms. Anderson received no prior notification regarding Appellant’s being transported to the police station or his being subjected to an uncounselled police interview in the station house.
Although “[tjhere is no constitutional requirement that police notify a juvenile’s parents prior to questioning the juvenile,” Frances v. State, 857 So.2d 1002, 1003 (Fla. 5th DCA 2003), a Florida statute specifically addresses the notification requirement and states in relevant part:
985.207 Taking a child into custody.—
* * *
(2) When a child is taken into custody as provided in this section, the person taking the child into custody shall attempt to notify the parent, guardian, or legal custodian of the child. The person taking the child into custody shall continue such attempt until the parent, guardian, or legal custodian of the child is notified or the child is delivered to a juvenile probation officer pursuant to s. 985.21, whichever occurs first. If the child is delivered to a juvenile probation officer before the parent, guardian, or legal custodian is notified, the juvenile probation officer shall continue the attempt to notify until the parent, guardian, or legal custodian of the child is notified.
§ 985.207, Fla. Stat. (2003). Even though the failure to notify Appellant’s parents or custodian does not, by itself, dispose of the Miranda waiver question, it is a factor deemed relevant to the voluntariness of the waiver of rights. See Allen v. State, 636 So.2d 494, 496 & n. 2 (Fla.1994); Brookins v. State, 704 So.2d 576, 578 (Fla. 1st DCA 1997) (finding record supported trial court’s determination that 16-year-old murder suspect, who had I.Q. of approximately 73 and was considered “borderline mentally retarded,” knowingly waived his Miranda rights).
In determining whether Appellant waived his Miranda rights, we shall not disturb any findings of fact that are supported by competent, substantial evidence. See State v. Setzler, 667 So.2d 343, 344-45 (Fla. 1st DCA 1995). What is striking about the present record, however, is the absence of any evidence and specific factual findings addressing the threshold issue *925 of whether Appellant elected to waive each of his rights “with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.” Moran, 475 U.S. at 421, 106 S.Ct. 1135. Merely reading the Miranda rights form to a 13-year-old like Appellant, or having him read the rights form, by itself, does not establish that he understood and comprehended the rights he was giving up and the real consequences of his waiver. Having carefully considered the totality of the factual circumstances presented to the trial court, we are constrained to conclude that the State failed to meet its heavy burden to show that Appellant knowingly, intelligently, and voluntarily waived his rights. See T.S.D. v. State, 741 So.2d 1142 (Fla. 3d DCA 1999).[2]

Law: Confessions

“A confession is not involuntary merely because the person making it is a juvenile.” T.B. v. State, 306 So.2d 183, 185 (Fla. 2d DCA 1975); Tennell v. State, 348 So.2d 937, 938 (Fla. 2d DCA 1977). “The erroneous admission of statements obtained in violation of Miranda rights is subject to harmless error analysis.” Caso v. State, 524 So.2d 422, 425 (Fla.1988); Mansfield, 758 So.2d at 644; Ramirez, 739 So.2d at 578. Error is harmless if the reviewing court can say beyond a reasonable doubt that “the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” DiGuilio, 491 So.2d at 1138. We address de novo the legal issues arising from Appellant’s oral statements to the authorities at the police station. See Miller, 474 U.S. at 110, 106 S.Ct. 445; Brancaccio, 773 So.2d at 583.
T.S.D., 741 So.2d at 1142, illustrates how an invalid waiver of rights can taint a subsequent confession. At the suppression hearing, neither party’s expert indicated that 12-year-old T.S.D. comprehended the idea that his Miranda rights included the right to have a lawyer present during the questioning when he gave a confession. Id. at 1143. The child had a history of psychological problems and an IQ of 62. He had a third-grade level reading ability, whereas the evidence indicated that Miranda rights are written at a sixth — or seventh-grade level. The record established that T.S.D.’s prior experience in the juvenile justice system did not assist him in understanding his Miranda rights. Where T.S.D. lacked the ability to understand the rights he was waiving, the Third District Court held his confession should not have been admitted into evidence. Id. at 1143. The delinquency adjudication was reversed, and the cause remanded with directions to enter an order suppressing the confession. Id. at 1144.
The undisputed testimony established that after Appellant repeatedly denied any wrongdoing, the dynamics in the police interview changed dramatically. That is, for about thirty minutes, Appellant repeatedly denied having touched the victim inappropriately. Although Detective White apparently led the questioning, Ms. Hocker was involved in the questioning and elicited the same denials of wrongdoing. It is further undisputed that the turning point in the interview occurred when Ms. Hocker (apparently without Detective White’s prior knowledge) referred to purported videotapes of Appellant inappropriately touching the victim. When Appellant asked whether he could see the videotapes, the detective adopted Ms. *926 Hocker’s ruse and answered that he could not, because the tapes were “in evidence.” Sometime after Detective White told Appellant that she thought he was lying, Appellant broke down, said he would tell the truth, and began divulging incriminating details that became more specific after additional prompting by the detective.
We cannot ignore the fact that the police placed 13-year-old Appellant in the interview room around 12:30 A.M., where he remained for 2-/£ hours before the questioning commenced. Appellant was effectively “alone” and without any adult with whom he could consult or on whom he could rely to protect his interests. The primary interrogator was a sex-crimes detective, whose duty was to get information about a suspected serious crime, and the interrogation took place in the station house. Appellant had no parent, guardian, legal custodian, or attorney present during any of these proceedings. While Ms. McBride, the victim’s mother, felt too upset to be in the interview room, her girlfriend, Ms. Hocker, who herself is a victim of childhood sexual abuse and considered the victim to be like a daughter, was present during all of the substantive questioning. Thirty minutes into the interrogation, Ms. Hocker abruptly initiated the line of questions using deception to elicit a confession from Appellant after his repeated denials of any wrongdoing. Given these circumstances, Ms. Hocker cannot reasonably be regarded as a protector of Appellant’s rights or interests. In fact, Ms. Hocker had strong personal motives to elicit a confession from Appellant, and she affirmatively assisted the police despite her assurances to Appellant that everything was going to be O.K. and nobody was going to hate him. The trial judge remarked on the record that Ms. Hocker “was not ... a neutral party.” Without a doubt, the questioning of Appellant in the police interview room constituted custodial interrogation; the authorities should have known their words or actions were “reasonably likely to elicit an incriminating response” from Appellant. Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); Loredo v. State, 836 So.2d 1103, 1105 (Fla. 2d DCA 2003). Addressing the question of whether a juvenile’s confession was freely and voluntarily made, the district court in Interest of G.G.P., 382 So.2d 128 (Fla. 5th DCA 1980), stated:
To be admissible in evidence, a confession and statements in the nature thereof must be freely and voluntarily made. At the time of the confession, the mind of the defendant must be free to act uninfluenced by either hope or fear.... If the totality of the circumstances were calculated to delude the accused or to exert undue influence over him, the confession must be excluded....
Id. at 129 (citations omitted); see Brewer, 386 So.2d at 235-36. The undisputed testimony concerning the sequence of events during Appellant’s interrogation compels only one conclusion: that Ms. Hocker’s deceptive questioning tactics (in which Detective White actively participated) relating to the non-existent videotape(s) deluded Appellant as to his “true position,” were coercive in their effect, and thereby undermined the voluntariness of his consent. See Frazier v. State, 107 So.2d 16, 21 (Fla.1958); State v. McCord, 833 So.2d 828 (Fla. 4th DCA 2002) (finding that defendant’s consent to taking saliva samples did not validate taking thereof, where consent was obtained through manipulation and deception); Williams v. State, 441 So.2d 653 (Fla. 3d DCA 1983).
In summary, the State failed to establish, first, that Appellant validly waived his Miranda rights; and, second, that Appellant’s subsequent oral statements were freely, knowingly, and voluntarily given. *927 See id. at 655. The trial court erred in denying the motion to suppress, and the error is undeniably harmful. In fact, at the adjudicatory hearing, the trial court’s characterization of Appellant’s oral admissions as “crucial evidence” belies any suggestion that admitting the confession into evidence constitutes harmless error.
The exclusionary rule applies to a violation of probation hearing. See Lambert v. State, 811 So.2d 805, 807 (Fla. 2d DCA 2002). After the adjudication of delinquency, the State used the commission of the sexual battery as the basis for revoking Appellant’s probation.
Accordingly, we REVERSE the final disposition order of delinquency and the probation revocation probation order and REMAND for further proceedings consistent with our holding.
BARFIELD and LEWIS, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The present facts are materially distinguishable from those in W.M. v. State, 585 So.2d 979 (Fla. 4th DCA 1991), in which the district court affirmed the trial court's finding that a 10-year-old had understood and waived his Miranda rights.