927 So.2d 219 (2006)
B.M.B., Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-2957.
District Court of Appeal of Florida, Second District.
May 3, 2006.
*220 James Marion Moorman, Public Defender, and Allyn M. Giambalvo, Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Susan D. Dunlevy, Assistant Attorney General, Tampa, for Appellee.
ALTENBERND, Judge.
B.M.B. appeals her adjudication for poisoning food or water with intent to kill or injure, a violation of section 859.01, Florida Statutes (2004). We conclude that the trial court erred in concluding that B.M.B. knowingly and voluntarily waived her Miranda[1] rights. Accordingly, the trial court erred in denying the motion to suppress her confession. We reverse and remand for a new trial.
On April 15, 2005, at the beginning of her sixth-period class, the music teacher at Franklin Middle School smelled a strange, chemical odor emanating from her lemonade. She took a single sip and noticed that it tasted like alcohol. After noticing that her bottle of whiteboard cleaning solution was almost empty, she concluded that her lemonade had been contaminated with *221 the solution. She threw the cup of lemonade in the trash, finished teaching sixth period, and then went to the emergency room. Someone at the emergency room called the Tampa Police Department to report the incident. An officer met the music teacher at the emergency room to get information and to file a police report. The music teacher was discharged from the emergency room the same day without having suffered any harmful physical effects.
The music teacher decided that someone had contaminated her lemonade with whiteboard cleaning solution at the end of her fifth-period class when she had left the cup of lemonade unattended and sitting next to the whiteboard cleaner on top of her piano. The music teacher made a list of six students who were possible suspects because they had been unsupervised for a brief time in the room with her lemonade.
The investigation into the matter was not conducted by the school's resource officer. Instead, a Tampa police detective was given the police report to conduct an investigation. It is worth considering whether this case would have been handled differently if it had been handled by the school resource officer and assistant principal. The detective was dressed in plain clothes but had his badge and gun visible. He set himself up in an office at the school and conducted individual, five-minute interviews with each of the six suspected students. He told the students he was investigating the incident but used this time principally to gather background information and to identify the person responsible.
At some point, the detective became suspicious of B.M.B., a fourteen-year-old girl with no prior contact with law enforcement. Thus, he decided to conduct a second, more thorough interview with her. The second interview was tape-recorded and lasted about fifteen minutes. B.M.B.'s parents were never contacted regarding the incident, B.M.B.'s involvement, or the investigation.
The detective did not read B.M.B. her Miranda warnings prior to conducting the second interview. He began discussing B.M.B.'s personal and family life with her, presumably to relax her. He then began questioning B.M.B. about the incident. He asked her how she knew the cup contained lemonade and misrepresented to her that people witnessed her putting "something" into the cup.[2] B.M.B. repeatedly denied putting anything in the lemonade, to which the detective responded, "We think you did." He asked her why she would "do something like that" and then suggested that maybe she did it because she was upset at the teacher or that it was just a joke or a prank.
The detective told B.M.B. that he had evidence that she committed the crime and then attempted to justify the contamination by stating, "If you took some stuff and you poured it in there and you thought it would just make it taste bad, then nobody would get hurt, you know, because you were mad." After B.M.B. continued to deny any involvement, he then told her, "Nobody's saying anything's going to happen to you but all we need just to do is get to the bottom of this and find out exactly what happened."
*222 The detective then turned off the tape recorder. He testified that he orally administered B.M.B. Miranda warnings. When he resumed recording, B.M.B. confessed to squirting some of the liquid into the teacher's lemonade. Based primarily on this confession, B.M.B. was found delinquent for the offense of poisoning with intent to kill or injure.[3]
The detective correctly decided that B.M.B. was in custody for Fifth Amendment purposes when he decided to give Miranda warnings. We agree that the evidence in this case indisputably leads to the conclusion that B.M.B. was subjected to a custodial interrogation during the second interview. See, e.g., Ramirez v. State, 739 So.2d 568, 574 (Fla.1999); J.G. v. State, 883 So.2d 915, 922 (Fla. 1st DCA 2004). The four-factor test for considering whether a suspect is in custody includes the consideration of "(1) the manner in which the police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; and (4) whether the suspect is informed that he or she is free to leave the place of questioning." Ramirez, 739 So.2d at 574. B.M.B. was taken alone into an interview room where she was subjected to questioning by a Tampa police detective despite her repeated denials of any involvement. The detective admitted that B.M.B. was a suspect in the case and that he confronted her with alleged evidence of her acts. There is no evidence that B.M.B. was told she was free to leave the interview; in fact, by all accounts she was not. We conclude that a reasonable juvenile would have believed that he or she was in custody at the time of the interrogation. Id.
Even though B.M.B. had been read her Miranda warnings before she confessed or made any inculpatory statements, in order for her confession to be admissible she must have knowingly and voluntarily waived her constitutional rights. Miranda, 384 U.S. 436, 86 S.Ct. 1602. It is the State's burden to prove that a waiver of Miranda rights was knowing and voluntary. Sliney v. State, 699 So.2d 662, 669 (Fla.1997). This burden is even heavier when the suspect is a juvenile. J.G., 883 So.2d at 923.
There is no bright-line rule that would render a confession by a juvenile involuntary. Ramirez, 739 So.2d at 577. Instead, the "totality of the circumstances" must be considered. Id. at 575. The supreme court has concluded certain factors must be considered when a juvenile is involved. These factors are: (1) "the manner in which the Miranda rights were administered, including any cajoling or trickery"; (2) "the suspect's age, experience, background and intelligence"; (3) "the fact that the suspect's parents were not contacted and the juvenile was not given an opportunity to consult with his or her parents before questioning"; (4) "the fact that the questioning took place in the station house"; and (5) "the fact that the interrogators did not secure a written waiver of the Miranda rights at the outset." Id. at 575-76.
When reviewing a motion to suppress, this court defers to the trial court's factual findings if they are supported by competent, substantial evidence and reviews legal conclusions de novo. Loredo v. State, 836 So.2d 1103 (Fla. 2d DCA 2003). The trial court erred as a matter of law in concluding that under the circumstances this fourteen-year-old juvenile with no prior *223 criminal involvement knowingly and voluntarily waived her Miranda rights. B.M.B. had never been read Miranda rights in the context of a criminal investigation. Because the detective stopped the tape when he claims to have given her the Miranda warnings, there is no evidence regarding the sufficiency of those warnings. Apart from the detective's testimony that B.M.B. acknowledged she understood the rights, the record is completely devoid of any other specific factual findings that B.M.B. clearly understood the rights and their significance. Merely reading B.M.B. her Miranda rights does not satisfy the State's "heavy" burden of proving that she comprehended the rights she was giving up and the real consequences of her waiver. J.G., 883 So.2d at 925.
B.M.B.'s age, experience, and background did not allow her to fully appreciate the gravity of the situation, especially considering the circumstances under which her confession was elicited. The detective suggested to B.M.B. that her actions were in the nature of a joke or a prank and seemed to suggest that they were understandable because B.M.B. was upset with her teacher for not letting her use the bathroom. There is no indication that B.M.B. understood that serious criminal charges could result from the investigation. Although she likely faced some charge of delinquency as a juvenile, the criminal offense which is the basis of the delinquency in this case is a first-degree felony normally punishable by up to thirty years in prison. When a juvenile faces the prospect of such a serious charge, it seems that there should be a heightened concern that the juvenile understands the nature of the Miranda rights and the potential consequences of waiving them.
B.M.B. was also not provided the opportunity to consult with a parent before being questioned. Because B.M.B. was a juvenile, the police were obligated to attempt, and continue to attempt, to notify her parents upon taking her into custody. Ramirez, 739 So.2d at 577; see also § 985.207(2), Fla. Stat. (2005). Failure to comply with this statutory requirement does not necessarily mean a Miranda waiver was unknowing and involuntary, but it is a factor that must be considered. Id. It is undisputed that B.M.B.'s parents were never informed of the investigation. In fact, the State, which bears the burden, failed to present any evidence that it ever even attempted to contact them.
B.M.B. was not questioned at a station house but was questioned at an office at her school. The Tampa police detective, whom she did not know, conducted the second interview by himself without any assistance from the principal, assistant principal, or school resource officer. To a school-age child, this setting is probably no less intimidating than a station house. Finally, the detective failed to ever obtain a written waiver of Miranda rights from B.M.B.
Based on a review of the totality of the circumstances, we conclude that the State failed to establish that B.M.B. validly waived her Miranda rights. We reverse the adjudication of delinquency and remand for further proceedings.
Reversed and remanded.
STRINGER and VILLANTI, JJ., Concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436; 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] If this statement was not a misrepresentation, there is no indication from the record that anyone told the detective that they witnessed B.M.B. adulterating the liquid. In fact, the detective testified that he became suspicious of B.M.B. not because there were witnesses to the incident but because of her fleeting eye contact and her knowledge that the cup contained lemonade.
[3] We note that the sufficiency of the evidence to prove poisoning "with intent to kill or injure another person" is not an issue presented in this appeal.