WALLACE, Judge.
Dwain D. Wallace, III, challenges the investigatory detention that led to the revocation of his probation. After Mr. Wallace was detained, he made inculpatory statements to the police. However, the informant — whose tip to the police was the basis for Mr. Wallace’s detention — was not simply an honest, disinterested citizen. Because this informant’s reliability was doubtful and because the police failed to corroborate the information that he had provided, Mr. Wallace’s detention was not based on a well-founded suspicion. For this reason, the trial court erred in failing to suppress the statements made by Mr. Wallace after his illegal detention. Accordingly, we reverse the trial court’s order that revoked Mr. Wallace’s probation.
The Facts
On April 12, 2002, eight officers from the Tampa Police Department — including one K-9 officer — were investigating narcotics offenses outside a lounge on Nebraska Avenue in Tampa. The officers were part of a special unit. They were not dressed in standard police uniforms. Instead, they each wore a vest that identified them as “POLICE.” There were four to six police vehicles at the scene.
Officer Randall J. Camp noticed a gold Mercedes Benz automobile parked in the vicinity of the lounge. The Mercedes attracted Officer Camp’s attention because it was illegally parked. Officer Camp shined his flashlight into the Mercedes and saw the handle of a pistol that was partially hidden beneath the front passenger seat. The pistol was not visible by looking through the front passenger window. Officer Camp was able to observe the handle of the pistol only by leaning over the vehicle’s hood to look directly under the seat. After Officer Camp spotted the pistol in the Mercedes, the police ran the license plate number to determine the identity of the vehicle’s registered owner. In addition, the K-9 officer walked her dog around the vehicle. The dog alerted for the presence of narcotics.
Next, Officer Camp went into the lounge. He testified later that there were at least forty men in the lounge. Officer Camp arranged for the lounge’s bouncer to ask for the owner of the Mercedes to step outside; the bouncer warned the patrons that the Mercedes would be towed unless it was moved. In response to this announcement, Mr. Ifeanyi Ike-Onyechi left the lounge and approached the Mercedes with his keys in his hand. The officers immediately detained Mr. Ike-Onyechi and handcuffed him. Officer Camp searched the Mercedes and recovered the pistol from beneath the front passenger seat. He also found a cigar containing marijuana on the floor in the back of the vehicle. Based on the presence of the firearm and the marijuana in the Mercedes, Mr. Ike-Onyechi was placed under arrest.
Officer Michael Liberti informed Mr. Ike-Onyechi of his rights under Miranda.[1] After being advised of his rights, Mr. Ike-Onyechi agreed to speak with the officers. He told Officer Liberti that he had arrived at the lounge in the Mercedes with two other men. Mr. Ike-Onyechi said that one of these men was called “Mooch.” According to Mr. Ike-Onyechi, he knew “Mooch” *725 through an automotive detailing shop. Mr. Ike-Onyechi never identified the third individual.
Mr. Ike-Onyechi told Officer Liberti that after he and the two other men had arrived at the lounge and he had parked and locked the Mercedes, “Mooch” asked him to unlock the car. According to Mr. Ike-Onyechi, “Mooch” explained that he had a gun that he could not take into the lounge and that he needed to lock it in the car. Using his keyless-entry remote, Mr. Ike-Onyechi unlocked the Mercedes and watched as “Mooch” opened the passenger door and placed an object in the car. Mr. Ike-Onyechi believed that the object was a gun. Mr. Ike-Onyechi then relocked the car, and the three men went into the club. In addition, Mr. Ike-Onyechi denied ownership of the marijuana cigar that was found on the floor in the back of the car.
After Mr. Ike-Onyechi had made these statements to Officer Liberti, Mr. Wallace walked out of the lounge. According to the officers, Mr. Wallace appeared to be calm and relaxed, and he walked at a casual pace. As Mr. Wallace walked past the officers, Mr. Ike-Onyechi identified him as “Mooch,” the man who had placed the pistol in the car. Officers Camp and Liberti immediately approached Mr. Wallace and detained him. Officer Camp testified that he advised Mr. Wallace of his rights under Miranda. Mr. Wallace acknowledged that he understood his rights, and he agreed to speak to the officers.
Officer Camp then interrogated Mr. Wallace. According to Officer Camp, Mr. Wallace initially denied that he had arrived at the lounge in the Mercedes with Mr. Ike-Onyechi. He also denied placing the pistol under the car’s front passenger seat. Mr. Wallace claimed that he had arrived at the lounge in a blue Corolla. However, after further questioning, Mr. Wallace admitted that he had been a passenger in the Mercedes and that he had placed the pistol under the front passenger seat. Mr. Wallace denied that he owned the pistol. Mr. Wallace ' said that Mr.. Ike-Onyechi had given, him the pistol when they had arrived at the lounge and that he had handled it only briefly after Mr. Ike-Onyechi asked him to place it under the seat. Mr. Wallace also admitted that he was a convicted felon.
Based on Mr. Wallace’s admissions, Officer Camp arrested him for being a convicted felon in possession of a firearm. The officers charged Mr. Ike-Onyechi with possession of marijuana, and they released him on his own recognizance. Mr. Wallace’s probation supervisor 'subséquently filed an affidavit alleging that Mr. Wallace had violated the terms and. conditions- of his probation by being in possession of a firearm.
The Proceedings in the Trial Court
Mr. Wallace moved to suppress the statements that he had allegedly made after he was detained outside the lounge. The trial court heard the motion to suppress and the violation of probation at the same time. The State called three witnesses at the hearing: (1) Mr. Wallace’s probation supervisor, (2) Officer Camp, and (3) Officer Liberti. The State did not call Mr. Ike-Onyechi. At the hearing, defense counsel represented to the trial court that Mr. Ike-Onyechi was “on the run” and that there was “an outstanding warn rant for his arrest.” The prosecutor did not contradict defense counsel’s representations.
At the hearing, Mr. Wallace testified that he had arrived at the lounge with his wife in a Ford Thunderbird. He denied that he had been in possession of a firearm, and he denied that he had made incriminating statements to the police officers... On the motion to suppress, defense counsel argued that Mr. Ike-Onyechi was *726 an unreliable informant whose tip was not sufficient to give the police officers a well-founded suspicion to detain Mr. Wallace. The trial court ruled “that the detention was okay.” On the violation of probation, the trial court deemed the police officers to be more credible than Mr. Wallace and found that he had violated condition five of his probation.[2]
When Mr. Wallace was arrested outside the lounge in Tampa, he was serving the probationary portions of two “true split sentence^].” See Poore v. State, 531 So.2d 161, 164 (Fla.1988), superseded on other grounds as recognized in Crews v. State, 779 So.2d 492 (Fla. 2d DCA 2000). Mr. Wallace had originally been sentenced to serve two concurrent twenty-five-year sentences. After serving fifteen years, the balances of the sentences were to be suspended and Mr. Wallace was to be placed on probation for a period of ten years. On October 21, 2002, after the trial court revoked Mr. Wallace’s probation, it reimposed the two concurrent twenty-five-year sentences. The trial court gave Mr. Wallace credit for all of the time he had previously served in the Department of Corrections and credit for the time he had spent in jail before the reimposition of his sentences. Unfortunately, Mr. Wallace’s trial counsel failed to file a timely notice of appeal on his behalf. On January 4, 2005, this court entered an order granting Mr. Wallace’s petition for a belated appeal. This appeal followed.
The Issue and the Standard of Review
On appeal, Mr. Wallace raises two issues. We need address only Mr. Wallace’s argument that the trial court erred in denying his motion to suppress the statements that the police testified that he had made after he was detained. We employ a mixed standard of review in considering the trial court’s ruling on Mr. Wallace’s motion to suppress. The trial court’s determination of historical facts enjoys a presumption of correctness and is subject to reversal only if not supported by competent, substantial evidence in the record. However, the trial court’s determinations on mixed questions of law and fact and its legal conclusions are subject to de novo review. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); E.B. v. State, 866 So.2d 200, 202 (Fla. 2d DCA 2004).
Discussion
As a preliminary matter, we note that the exclusionary rule applies in proceedings for the revocation of probation. See State v. Scarlet, 800 So.2d 220, 221-22 (Fla.2001). Thus “evidence discovered during an unlawful detention and search is not admissible during a hearing to revoke probation.” Lanier v. State, 936 So.2d 1158, 1162 (Fla. 2d DCA 2006) (citing Scarlet and Williams v. State, 791 So.2d 37, 38 (Fla. 2d DCA 2001)). Accordingly, if Mr. Wallace’s detention was unlawful, then any statements that he allegedly made during that detention should have been suppressed. See Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); J.G. v. State, 883 So.2d 915, 926-27 (Fla. 1st DCA 2004); Lee v. State, 868 So.2d 577, 581-82 (Fla. 4th DCA 2004).
There are three levels of police encounters: (1) a consensual encounter; (2) an investigatory stop as described in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and (3) an arrest. See Popple v. State, 626 So.2d 185, 186 (Fla. *727 1993). In this case, the parties agree that the police made an investigatory stop of Mr. Wallace after he walked out of the lounge and was identified as “Mooch” by Mr. Ike-Onyechi.
In Popple, the Supreme Court of Florida outlined the characteristics of an investigatory stop:
At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. § 901.151 Fla. Stat. (1991). In order not to violate a citizen’s Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop. Carter v. State, 454 So.2d 739 (Fla. 2d DCA 1984).
Id. at 186. In assessing whether the police had a well-founded suspicion to conduct an investigatory detention of Mr. Wallace, we must consider all facts known to the police at the time of the stop. See Parsons v. State, 825 So.2d 406, 408-09 (Fla. 2d DCA 2002) (citing Bartlett v. State, 508 So.2d 567, 568 (Fla. 2d DCA 1987)). The factors to be considered include “time, location, suspect’s physical appearance, suspect’s behavior, or anything unusual that suggests criminal activity.” Id. at 409.
In this case, the testimony of both officers suggested that they believed that Officer Camp had found an illegally concealed firearm when he observed a pistol partially hidden beneath the passenger seat of the Mercedes. The parties have assumed that Officer Camp’s observation raised a reasonable suspicion that someone had committed or was committing the crime of carrying a concealed firearm, a violation of section 790.01(2), Florida Statutes (2001).[3] But there was nothing about *728 the presence of a pistol in Mr. Ike-Onye-ehi’s Mercedes that linked Mr. Wallace to any criminal activity. Instead, Mr. Ike-Onyechi’s account of what had happened when he arrived at the lounge with “Mooch” and the unidentified third man— not the presence of a pistol in the Mercedes — was the factor that prompted the police to detain and interrogate Mr. Wallace. Thus, in assessing whether the police had a reasonable suspicion to detain and interrogate Mr. Wallace, we must turn our attention to Mr. Ike-Onyechi’s tip.
 “When an officer acts on an informant’s tip, the reliability of the information must be established before the officer can make an investigatory stop.” Jacoby v. State, 851 So.2d 913, 915 (Fla. 2d DCA 2003) (citing Travers v. State, 739 So.2d 1262, 1263 (Fla. 2d DCA 1999)). “[A]n informant’s ‘veracity,’ ‘reliability’ and ‘basis of knowledge’ are all highly relevant in determining the value of his report.” Illinois v. Gates, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). “[H]owever, ... these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case.” Id. “[A] deficiency in one [element] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.” Id. at 233, 103 S.Ct. 2317. Thus the reliability of an informant may be established by a variety of methods.
In this case, we are not concerned with an anonymous tipster. Instead, Mr. Ike-Onyechi was an informant who had been identified by name and who was providing information to the police in person. The State argues that these facts alone were sufficient to establish the reliability of Mr. Ike-Onyechi’s tip and to provide a reasonable suspicion for the investigatory detention of Mr. Wallace. In effect, the State suggests that for the purpose of determining his veracity, Mr. Ike-Onyechi should be treated as a “citizen-informant.”
Generally speaking, a citizen-informant is an ordinary citizen who has either been the victim of or a witness to a crime and who reports the pertinent facts to law enforcement officials. See, e.g., State v. Gavin, 594 So.2d 345 (Fla. 2d DCA 1992) (report by a witness concerning the burglary of a restaurant). “A citizen-informer is one who is ‘motivated not by pecuniary gain, but by the desire to further justice.’ ” State v. Talbott, 425 So.2d 600, 602 n. 1 (Fla. 4th DCA 1982) (quoting Barfield v. State, 396 So.2d 793, 796 (Fla. 1st DCA 1981)). Information provided by a citizen-informant “is at the high end of the tip-reliability scale.” State v. Maynard, 783 So.2d 226, 230 (Fla.2001). “[I]f an unquestionably honest citizen comes forward with a report of criminal activity — which if fabricated would subject him to criminal liability — ... rigorous scrutiny of the basis of his knowledge [is] unnecessary.” Gates, 462 U.S. at 233-34, 103 S.Ct. 2317.
Here, when Mr. Ike-Onyechi gave his tip to the police, he was already detained and in handcuffs. He had just watched the police remove a partially hidden firearm and a marijuana cigar from his car. Whether or not the presence of the firearm in the vehicle was a crime, the police were treating the incident as a violation of section 790.01(2). For these reasons, Mr. Ike-Onyechi could have had a strong motive to fabricate an explanation for the presence of the hidden firearm in his vehicle that exculpated himself and implicated someone else. Even Officer Liberti conceded at the hearing in the trial court that but for Mr. Ike-Onyechi’s statement implicating Mr. Wallace, there was “a good possibility” that Mr. Ike-Onyechi would have been arrested for the possession of a *729 concealed firearm. Thus Mr. Ike-Onyechi did not qualify as a citizen-informant. Further police investigation of his tip was necessary before Mr. Wallace could be detained.
The State’s argument assumes that the report of an informant who has been identified — as opposed to an anonymous tipster — need not otherwise be shown to be reliable. This is not the case. See State v. Novak, 502 So.2d 990, 993 (Fla. 3d DCA 1987). As one astute commentator on the subject observes:
It does not follow ... that if the name of the person providing the information is disclosed, then he is by virtue of that fact alone properly characterized as a citizen-informer entitled to the presumption of reliability. “That a person is named is not alone sufficient grounds on which to credit an informer, but it is one factor which may be weighed in determining the sufficiency of an affidavit.” Thus, if the person giving the information to the police is identified by name but it appears that this person was a participant in the crime under investigation or has been implicated in another ■ crime and is acting in the hope of gaining leniency, then the more strict rules regarding the showing of veracity applicable to an informer from the criminal milieu must be followed.
2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.4(a), at 236-37 (4th ed. 2004) (citation and footnotes omitted). Here, Mr. Ike-Onyechi was not only an apparent participant in the possession-of-marijuana offense that was under investigation by the police, but he also had an obvious self-interest in implicating Mr. Wallace to avoid additional criminal liability for the supposed firearms offense. Thus Mr. Ike-Onyechi’s veracity was doubtful, and his tip — standing alone — did not give the police a well-founded suspicion to conduct an investigatory detention of Mr. Wallace. See Dudley v. State, 667 So.2d 428 (Fla. 2d DCA 1996); Dial v. State, 798 So.2d 880 (Fla. 4th DCA 2001); Roper v. State, 588 So.2d 330 (Fla. 5th DCA 1991); Novak, 502 So.2d 990; State v. Rizo, 463 So.2d 1165 (Fla. 3d DCA 1984).
Our conclusion about the unreliability of Mr. Ike-Onyechi’s tip does not end our analysis. We must still determine whether any other facts known to the police when they detained Mr. Wallace — considered together with Mr. Ike-Onyechi’s tip — provided a reasonable suspicion for the investigatory detention. However, the possibility of additional facts that might bear on the reliability of the tip is limited. Mr. Ike-Onyechi did not provide detailed and verifiable information that the police could have used to corroborate his tip. See, e.g., State v. Walker, 898 So.2d 198, 200-01 (Fla. 2d DCA 2005). Nor could the tip be corroborated by reference to predictions about Mr. Wallace’s future behavior. See, e.g., State v. Evans, 620 So.2d 802, 803 (Fla. 2d DCA 1993). On the contrary, Mr. Ike-Onyechi’s tip amounted to nothing more than a bare accusation that Mr. Wallace was a participant in conduct that the police were investigating as a criminal offense. Moreover, Mr. Ike-Onyechi’s statements to the police did not qualify as a declaration against penal interest. See, e.g., United States v. Harris, 403 U.S. 573, 583-84, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); State v. Irizarry, 948 So.2d 39 (Fla. 5th DCA 2006). Mr. Ike-Onyechi denied any connection to either the pistol or the marijuana. Perhaps the unidentified third man who had also arrived at the lounge in the Mercedes might have bolstered Mr. Ike-Onyechi’s claims. See, e.g., Green v. State, 946 So.2d 558, 562 (Fla. 1st DCA 2006). However, the police did not attempt to locate and speak with the third man to obtain a corroborating statement *730 before they detained Mr. Wallace. Instead, they detained Mr. Wallace as soon as Mr. Ike-Onyechi identified him.
The foregoing review of the likely sources of corroboration for Mr. Ike-Onyechi’s tip seems to exhaust the available possibilities. Since the uncorroborated tip was insufficient to provide a well-founded suspicion for Mr. Wallace’s detention, the trial court erred in failing to suppress Mr. Wallace’s statements. Accordingly, we reverse the order of revocation of probation.
The only evidence presented at the hearing that linked Mr. Wallace to the possession of the pistol were his statements as testified to by the police and the hearsay accusation made by Mr. Ike-Onyechi. With the suppression of Mr. Wallace’s statements, the only evidence supporting the revocation of his probation is the hearsay accusation made by Mr. Ike-Onyechi. A revocation of probation may not be based solely upon hearsay statements. See Garcia v. State, 701 So.2d 607, 608 (Fla. 2d DCA 1997). Thus, on remand, the trial court shall reinstate Mr. Wallace’s probation.
Reversed and remanded with instructions.
LaROSE, J., Concurs with opinion.
SILBERMAN, J., Dissents with opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Standard condition five of Mr. Wallace’s probation required that he "live and remain at liberty without violating the law.”

. Section 790.001(2) defines the term "concealed firearm," which appears in section 790.01(2). A concealed firearm is "any firearm ... which is carried on or about a person in such a manner as to conceal the firearm from the ordinary sight of another person.” § 790.001(2). Section 790.01(2) provides that "[a] person who carries a concealed firearm on or about his or her person commits a felony of the third degree.” In this case, the evidence suggests that the pistol may not have been visible by ordinary observation to a person standing beside the gold Mercedes. Thus the pistol may have been hidden "from the ordinary sight of another person” within the meaning of section 790.001(2). See Dorelus v. State, 747 So.2d 368, 372-73 (Fla.1999); L.G. v. State, 693 So.2d 1020, 1022 (Fla. 3d DCA 1997). But to constitute a "concealed firearm” under the statute, the firearm must also be carried "on or about a person.” A firearm is carried on or about a person if it is "physically on the person or readily accessible to him. This generally includes the interior of an automobile and the vehicle’s glove compartment, whether or not locked.” Ensor v. State, 403 So.2d 349, 354 (Fla.1981), modified on other grounds by Dorelus, 747 So.2d at 371-73. Here, when the police found the pistol, it was located inside a locked, unattended vehicle. For that reason, the pistol was not on any person, and it was not readily accessible to any person either. Mr. Ike-Onyechi, who had the keys to the Mercedes, was inside the lounge. Although the issue is not before us, we question whether — -under these circumstances — the police had a reasonable suspicion that anyone had violated or was violating section 790.01(2). See Gehring v. State, 937 So.2d 169, 170-71 (Fla. 2d DCA 2006); Lamb v. State, 668 So.2d 666, 667-68 (Fla. 2d DCA 1996); White v. State, 902 So.2d 887, 888 (Fla. 1st DCA 2005). Additionally, the police did not know that Mr. Wallace was a convicted felon when they detained him outside the lounge. But on this point, Mr. Wallace has argued only the unreliability of Mr. Ike-Onyechi’s tip to link him to the supposed concealed firearm violation that the police were investigating, not the absence of a reason to believe that any violation had occurred at all. Accordingly, in disposing of this case, we have not considered the possibility that the police did not have a reasonable suspicion to believe that a violation of section 790.01(2) had occurred when they detained Mr. Wallace.